KING, C.J.,
for the Court:
¶ 1. The Lamar County Chancery Court granted a divorce to Lauren Tatum from Joseph Tatum III on the ground of adultery. The chancellor divided the marital assets valued at approximately $978,000, awarded Lauren alimony, and ordered Joseph to pay child support. Aggrieved, Joseph appeals, raising five issues: (1) whether the chancellor erred as a matter of law in his failure to properly consider the Ferguson factors governing the equitable distribution of the marital assets; (2) whether the chancellor erred as a matter of law in awarding alimony; (3) whether the chancellor erred in his calculation of child support; (4) whether the chancellor erred in placing the savings for the children in Lauren’s name rather than in both parties’ names or the children’s names only; and (5) whether the chancellor erred as a matter of law in awarding attorney’s fees to Lauren. We affirm the judgment of the chancellor as to the distribution of the marital assets, alimony, child support, and the placement of Lauren’s name on the children’s savings accounts; however, we reverse and remand as to that portion of the judgment regarding the award of attorney’s fees.
FACTS
¶ 2. Lauren and Joseph married on May 12, 2001, in Forrest County, Mississippi. The couple subsequently moved to Purvis, Lamar County, Mississippi, where they lived together with their children for more than six years until their separation. The *858 Tatums are the parents of two children, Britton A. Tatum, born on June 22, 2000, and Cora A. Tatum, born on February 8, 2002.
¶ 3. After the parties were married, Joseph and Lauren agreed that Joseph would work, and Lauren would stay home with the children. Throughout the marriage, Joseph was the primary breadwinner while Lauren was primarily responsible for household chores and caring for the children.
¶ 4. On September 18, 2007, Lauren filed for divorce alleging adultery, habitual cruel and inhuman treatment, and, alternatively, irreconcilable differences. In her complaint, Lauren asked the court for custody of the children; reasonable child support, including tuition for private school; alimony; equitable distribution of the marital assets and liabilities; medical insurance for herself and the children; payment of all medical, dental and other related expenses not covered by insurance; and payment of her attorney’s fees and court costs.
¶ 5. After a hearing on November 13, 2007, the chancellor entered a temporary order on November 29, 2007, granting Lauren exclusive use and occupancy of the marital home and joint legal custody of the children. Joseph was ordered to pay $3,811 in spousal and child support, pay the outstanding balance for Britton’s speech therapy, and pay an outstanding balance for services rendered by the Hat-tiesburg Clinic. In addition, both parties were granted permission to remove $25,000 from their joint savings account. Joseph and Lauren were ordered not to waste or dispose of any other assets of the marital estate. Both parties were also ordered to abide by the set visitation schedule.
¶ 6. On March 18, 2008, the chancellor conducted a trial on the grounds for divorce. As a result, Lauren was granted a divorce on the ground of adultery, and the chancellor held open the issues of property distribution, alimony, and child support. The chancellor also directed the parties to attempt to agree upon an appraiser to determine the value of the real property accumulated during the marriage. On March 27, 2008, Joseph and Lauren reported to the chancellor that they had agreed to hire Greg Wheeler, a real-estate appraiser, to determine the value of the real property accumulated during the marriage. On June 4, 2008, and June 25, 2008, the chancellor tried the issues of child custody and visitation, division of the marital property, child support, and alimony. On October 1, 2008, the chancellor rendered a judgment regarding child support, visitation, distribution of property, and alimony. Taking into account the record, the chancellor awarded Joseph and Lauren joint legal custody of the minor children with Lauren having primary physical custody and Joseph receiving reasonable visitation. The chancellor divided the marital assets. The chancellor awarded Lauren the marital home, the household items, the money market account, a sum of $50,000 to be paid immediately, the Toyota Highlander, funds remaining in Lauren’s accounts at both Regions Bank and Trustmark Bank, and funds remaining in the American Funds IRA. Joseph was ordered to immediately quitclaim his interest in the marital home to Lauren. The chancellor awarded Joseph the properties in Luxury Holdings, the funds in Joseph’s checking account, the funds in the Luxury Holdings account, the funds in the Luxury Properties bank account, the Tidewater boat, the Bad Boy Buggy, and one-half of the value of the stimulus check. Lauren was ordered to quitclaim her interest in the Luxury Holdings.
*859 ¶ 7. The chancellor determined the following items to be non-marital property belonging to Lauren: the Smith Barney ROTH IRA account (# XXX-XXXXO), the .357 Magnum revolver, and the 30.06 rifle. The chancellor determined that the three-acre lot adjacent to the martial home, the 1998 mobile home, the Smith Barney 401K, the Smith Barney stock account, the Smith Barney ROTH IRA account (# XXX-XXXX9), the Fidelity account, the gun safe, and the guns other than those previously identified as belonging to Lauren, were non-marital property belonging to Joseph. The chancellor also directed that each party would retain ownership of the items not specifically identified in the judgment that was in his or her possession as of June 25, 2008. The chancellor ordered Joseph to pay $750 per child in monthly child support; provide health and hospitalization insurance for the children; pay three-quarters of the costs of the children’s medical costs not covered by insurance; maintain life insurance in his name with each child named as the beneficiary of $250,000; timely pay the children’s tuition, registration, and student fees for private school; pay for the extracurricular activities of the children in which he enrolls the children; and pay Lauren $48,000 in rehabilitative alimony, payable at a rate of $2,000 per month for twenty-four months. The chancellor held that Joseph would claim the children as dependents for tax purposes. In addition, Joseph was ordered to pay $15,000 for Lauren’s attorney’s fees. Lauren was ordered to pay for the extracurricular activities in which she enrolls the children.
¶ 8. Aggrieved, on October 10, 2008, both Joseph and Lauren filed motions to amend the judgment. Lauren requested the chancellor to modify the judgment in the following manner: (1) give Joseph every other weekend visitation from 5:00 p.m. on Friday afternoon until 5:00 p.m. on Sunday afternoon; (2) require Joseph to pay $36,974.04, which represented all the attorney’s fees that she had incurred in this action and all additional attorney’s fees she will incur in the future; and (3) find Joseph in contempt, require him to pay immediately the outstanding balance due to Hattiesburg Clinic, and impose all sanctions the chancellor deems appropriate. Joseph requested the chancellor to grant a new trial or alter the judgment. Specifically, Joseph requested that the chancellor amend the award of alimony, attorney’s fees, division of marital assets, child support, and the placing of Lauren’s name on the children’s savings account. The chancellor denied the parties’ motions to amend the judgment of divorce, and Joseph timely appealed on November 12, 2008.
STANDARD OF REVIEW
¶ 9. “The Court employs a limited standard of review on appeals from chancery court. If substantial credible evidence supports the chancellor’s decision, it will be affirmed.” Reddell v. Reddell, 696 So.2d 287, 288 (Miss.1997). “This Court will not disturb the findings of a [cjhancel-lor unless the [cjhancellor was manifestly wrong, clearly erroneous!,] or an erroneous legal standard was applied.” Bell v. Parker, 563 So.2d 594, 596-97 (Miss.1990).
ANALYSIS
I. Distribution of the Marital Assets
¶ 10. Joseph asserts that the chancellor erred as a matter of law because he failed to properly consider the Ferguson factors when distributing the marital assets. Joseph contends that the chancellor divided the assets equally although many of the assets came to Joseph through inheritance, gifts, or his own income.
*860 ¶ 11. In determining the equitable distribution of marital assets and debts, the chancellor must first classify each asset as marital or non-marital. Hemsley v. Hemsley, 639 So.2d 909, 915 (Miss.1994). Once that determination is made, the chancellor must evaluate the equitable division of all marital property pursuant to the guidelines listed in Ferguson v. Ferguson, 639 So.2d 921, 928 (Miss.1994). An equitable distribution does not mean that the chancellor is required to divide the property equally. Drumright v. Drumright, 812 So.2d 1021, 1026 (¶ 14) (Miss.Ct.App.2001). Equitable division of marital property is left to the discretion and conscience of the chancellor, “having in mind all the equities and other relevant facts and circumstances.” Humphries v. Humphries, 904 So.2d 192, 198 (¶ 24) (Miss.Ct.App.2005).
¶ 12. “When reviewing a chancellor’s judgment in property division we are not to conduct a Ferguson analysis anew, but we are to review the judgment to ensure that the chancellor followed the appropriate standards and did not abuse his discretion.” Jackson v. Jackson, 922 So.2d 53, 59 (¶ 16) (Miss.Ct.App.2006). In his bench opinion, the chancellor first addressed what property was considered marital and non-marital property. Thereafter, the chancellor weighed the evidence against the following Ferguson factors discussed below to make a determination as to the appropriate distribution of Joseph and Lauren’s marital assets.

(1)Substantial contribution to the accumulation of the property

¶ 13. The chancellor recognized that most of the marital assets came by way of Joseph, either through gifts from his family or his income. ' The chancellor opined that weight should be given to Lauren’s role as a stay-at-home mom, because her role was an in-kind contribution to the household. Lauren reared the children, made the house a home for the family, and performed her role as a wife and a mother while Joseph worked. The chancellor recognized that the parties would not have been in their current position unless Joseph had access to the financial benefits he received or accumulated throughout the marriage.

(2) The degree to which each spouse has expended, withdrawn or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree, or otherwise

¶ 14. The chancellor indicated that Joseph and Lauren were allowed to expend certain funds for taxes and the purchase of a vehicle, but neither party had disposed of any marital assets without the agreement of the other party.

(3) The value of assets not ordinarily, absent equitable factors to the contrary, subject to such distribution, such as property brought to the marriage by the parties and property acquired by inheritance or inter vi-vos gift by or to an individual spouse

¶ 15. The chancellor held that the three-acre lot next to the homestead was not marital property because it was given as a gift to Joseph from his father and it was titled in Joseph’s name only. The chancellor opined that the property was not intended to be joint property, and there was no proof that the property was ever commingled. In addition, the chancellor held that: the IRA account Joseph mentioned during his testimony; the Vinson four-wheeler, which was a gift from Joseph’s mother; the tools; the gun safe; and the television listed in Joseph’s Hems-ley report were all non-marital property. The chancellor recognized that Joseph had other non-marital property that he had *861 acquired from trusts, investments, or some other entity created by his father or parents; however, the value of that property was unknown.

(4)The market value and the emotional value of the assets subject to distribution

¶ 16. In regard to the household furnishings, the chancellor chose to use Lauren’s appraisal from her 8.05 financial statement when placing a value on the household furnishings and awarded Lauren all the household items.

(5) Tax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution

¶ 17. The chancellor noted that he was not aware of any tax consequences associated with the distribution of the marital property.

(6) The extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties

1118. Friction existed between the parties as Lauren had been granted a divorce from Joseph on the ground of adultery. The chancellor made an equitable distribution of the marital assets in order to minimize periodic payments and other potential sources of future friction. However, after equitably dividing the marital assets, the chancellor found that Lauren who had been a stay-at-home mom for more than six years, would require additional income to be self-sufficient. The chancellor noted that Lauren possessed a college degree, and with some additional time and training, she could return to gainful employment. Therefore, in an effort to give Lauren an opportunity to return to the workforce, the chancellor awarded Lauren rehabilitative alimony for a period of two years.

(7)The needs of the parties for financial security with due regard to the combination of assets, income, and earning capacity

¶ 19. The evidence indicated that Lauren and Joseph had agreed early in their marriage that Lauren would be a stay-at-home mother, and Joseph would provide financially for the family. The chancellor opined that because of Lauren and Joseph’s decision that Lauren would not work during the marriage, Lauren lacked financial security. However, Joseph had financial security. The chancellor also indicated that Joseph was better off financially than Lauren because Joseph had other non-marital assets that he had obtained through inheritance and gifts from his parents, as well as gifts from the family business.

(8)Any other factor which in equity should be considered

¶ 20. The chancellor found no evidence of this factor.
¶ 21. The chancellor ruled that although Joseph was the primary breadwinner, Lauren had contributed significantly to the parties’ accumulation of property by caring for the parties’ two minor children and making their house a home. The chancellor opined that because Joseph and Lauren had worked together to accumulate assets, the marital assets should be divided equally. The supreme court has recognized that “marital partners can be equal contributors whether or not they both are at [sic] work in the marketplace.” Hemsley, 639 So.2d at 915. Reviewing the chancellor’s judgment, according to Ferguson, we find that the chancellor did not abuse his discretion. Therefore, this issue is without merit.
*862 ¶ 22. Joseph also argues that the chancellor made a guestimation concerning certain purported undisclosed marital assets. The record does not indicate that the chancellor considered assets marital or non-marital that were not disclosed in the parties’ 8.05 financial statements or the Hemsley report. Thus, this issue is without merit.
II. Alimony
¶23. The chancellor awarded Lauren rehabilitative alimony of $48,000, payable at $2,000 per month. “Rehabilitative alimony provides for a party who is trying to become self-supporting and prevents that party from becoming destitute while searching for a means of income.” McCarrell v. McCarrell, 19 So.3d 168, 170 (¶ 8) (Miss.Ct.App.2009) (citation omitted). “Moreover, ‘the primary purpose of rehabilitative alimony is to give the former spouse the opportunity to enter the work force.’ ” Id.
¶ 24. Joseph asserts that the chancellor erred as a matter of law in awarding alimony. Joseph argues that the chancellor failed to properly consider the Armstrong factors and applicable law governing alimony. Armstrong v. Armstrong, 618 So.2d 1278 (Miss.1993). Joseph contends that the chancellor made purely speculative findings of fact regarding Joseph’s wealth and did not account for Joseph’s actual liabilities, income, and assets when determining alimony.
¶ 25. In a bench opinion, the chancellor awarded alimony pursuant to his analysis of the Armstrong factors.

(1)Health and age of the parties

¶ 26. The chancellor noted that at the time of the trial, both Joseph and Lauren were in their early 30s and were in good health.

(2)Income and earning capacity of each party

¶27. The chancellor opined that although Lauren had household expenses, at the time of the proceedings, she did not have a present income to meet those expenses. However, the evidence indicated that there was nothing that would prohibit Lauren from earning an income. The chancellor indicated that Joseph was employed with his family’s business and currently earning an income.

(3)Needs of each party

¶ 28. The record did not indicate that either party had any special needs.

(4) Obligations and assets of each party

¶ 29. The chancellor opined that neither Joseph nor Lauren had any debts at this time; therefore, all assets were free and clear.

(5) Length of the marriage

¶ 30. At the time of the divorce proceeding, Joseph and' Lauren had been married for more than six years.

(6)Presence or absence of minor children

¶ 31. The parties had two minor children in the home at the time of the divorce. The chancellor indicated that the minor children required one or both parents to pay for or personally provide child care.

(7)Standard of living both during the marriage and at the time of separation

¶ 32. The chancellor noted that during the marriage the parties lived well, but they did not live an excessively luxurious lifestyle. The chancellor further found that neither party desired to live such a lifestyle. The chancellor noted that Joseph came from a well-to-do family, and his children and spouse were the beneficiaries *863 of that privilege. The chancellor also noted that Joseph was employed with the family’s business and that he received gifts from his parents as well as his place of employment.

(8)Tax consequences

¶ 33. The chancellor indicated that the tax consequences of the spousal support order had been considered by the court.

(9)Fault or Misconduct

¶ 34. The chancellor noted that Joseph’s adultery during the marriage was the reason for the destruction of the marital relationship.

(10)Wasteful dissipation of assets by either party

¶ 35. The chancellor found that there was no evidence of any dissipation of assets by either party.
¶ 36. Lauren and Joseph were married for more than six years. The parties agreed early in the marriage that Lauren would be a stay-at-home mom caring for their two minor children and their home and that Joseph would work outside the home. Although Lauren was not employed throughout the marriage, Lauren testified that she did have a degree in psychology and had operated a printing center from 1995-2002. When questioned as to possible employment in the field of psychology, Lauren responded that she would need additional education to obtain employment in that field. During the hearing in June 2008, Lauren stated that for the past two months she had been seeking employment in other areas. The chancellor found that Lauren was capable of gainful employment, but she needed some time and assistance to make the transition from being a stay-at-home wife and mother.' We find that the chancellor did not abuse his discretion by awarding Lauren rehabilitative alimony in the amount of $2,000 per month for twenty-four months to assist in her transition back to the workforce.
III. Child Support
¶ 37. Joseph asserts that the chancellor’s directing him to pay private-school tuition and three-quarters of medical expenses in addition to child support, exceeds the statutory child-support guidelines. Joseph argues that the calculations made by the chancellor with respect to child support were not supported by the record or evidence presented at trial, and there were no findings of fact or conclusions of law as required by the applicable law to justify awarding more child support than the guidelines required. Joseph contends that the chancellor did not make an on-the-record analysis to justify a deviation from the Mississippi child-support guidelines.
¶ 38. According to Mississippi Code Annotated section 43-19-101 (Rev.2009), child-support payment is based on the individual’s adjusted gross income. Income includes but is not limited to the following:
[Wlages and salary income; income from self-employment; income from commissions; income from investments, including dividends, interest income and income on any trust account or property; absent parent’s portion of any joint income of both parents; workers’ compensation, disability, unemployment, annuity and retirement benefits, including an individual retirement account (IRA); any other payments made by any person, private entity, federal or state government or any unit of local government; alimony; any income earned from an interest in or from inherited property; any other form of earned income; and gross income shall exclude any monetary benefits derived from a second household, such as income of the absent parent’s current spouse[.]
*864 Miss.Code Ann. § 4S-19-101(S)(a). Once the individual’s gross income is obtained, the court is required to subtract the legally mandated deductions from the total income according to Mississippi Code Annotated section 43 — 19—101(B)(b). The court may then award a percentage of the adjusted gross income as support based on the number of children to be supported. In accordance with Mississippi Code Annotated section 43-19-101(1), the child-support guidelines indicate that twenty percent of the adjusted gross income should be awarded for support if there are two children to support. However, according to Mississippi Code Annotated section 43-19-103 (Rev.2009), the chancellor is allowed to deviate from the statutory guidelines when the following criteria are met:
(a) Extraordinary medical, psychological, educational or dental expenses.
(b) Independent income of the child.
(c) The payment of both child support and spousal support to the obligee.
(d) Seasonal variations in one or both parents’ incomes or expenses.
(e) The age of the child, taking into account the greater needs of older children.
(f) Special needs that have traditionally been met within the family budget even though the fulfilling of those needs will cause the support to exceed the proposed guidelines.
(g) The particular shared parental arrangement, such as where the noncustodial parent spends a great deal of time with the children thereby reducing the financial expenditures incurred by the custodial parent, or the refusal of the noncustodial parent to become involved in the activities of the child, or giving due consideration to the custodial parent’s homemaking services.
(h) Total available assets of the obligee, obligor and the child.
(i)Any other adjustment which is needed to achieve an equitable result which may include, but not be limited to, a reasonable and necessary existing expense or debt.
¶ 39. The chancellor ordered Joseph to pay $750 per child in monthly child support; provide health and hospitalization insurance for the children; pay three-quarters of the costs of the children’s medical costs not covered by insurance; maintain a life-insurance policy with each child named as the beneficiary of $250,000; timely pay the children’s private-school tuition, registration, and fees; and pay for the extracurricular activities for the children in which he enrolled them. During the hearing, Joseph’s counsel objected to the awarding of $1,500 per month in child support and to Joseph having to pay the tuition for private school, medical insurance, three-quarters of the children’s medical expenses not covered by insurance, and life insurance, arguing that Joseph’s aggregate adjusted gross income was only $42,083. The chancellor opined that review of Joseph’s 8.05 financial statement and income tax statements from 2005 through 2007, indicated that Joseph was able to support his children in the lifestyle to which they have become accustomed. The chancellor indicated that evidence existed that Joseph had additional non-marital assets. The chancellor stated that although he was not aware of what those assets were or the amount of those assets, additional assets did exist. The record indicated that although Joseph was employed in sales at Loresco, Inc., a family business, earning approximately $60,000 gross income annually, Joseph had a personal and financial interest in Land Management, Ltd; Land Partners Limited Partnership; Tatum Timber Co.; Tatum Development Corp.; Pursue Energy Corp.; Luxury Holdings, LLC; Luxury *865 Properties, LLC; and taxable income from various foreign sources. Tax returns for 2005 through 2007 indicated that Joseph’s adjusted gross income was $161,877, $146,143, and $131,787, respectively. This Court has previously held that the chancellor may deviate from child-support guidelines if the parent’s adjusted gross income is greater than $50,000 and if the chancellor finds the application of the guidelines inappropriate. Dunn v. Dunn, 911 So.2d 591, 600 (¶ 27) (Miss.Ct.App.2005). Therefore, the chancellor was not in error in deviating from the child-support guidelines. This issue is without merit.
IV. Savings Accounts
¶ 40. Joseph asserts that the chancellor erred in placing the children’s savings in Lauren’s name rather than in both parties’ names or the children’s names only. Joseph contends that there was no factual, legal, or logical reason to do so, especially since the funds in the account came principally from Joseph and the accounts were not considered for equitable distribution. Lauren argues that because Joseph failed to cite any authority to support this issue, then this Court should reject this issue pursuant to Mississippi Rule of Appellate Procedure 28(a)(6).[1]
¶ 41. The record does not indicate that the chancellor abused his discretion by placing Lauren’s name on the savings accounts for the children. Therefore, this Court finds no reason to disturb the chancellor’s ruling. Thus, this issue is without merit.
V. Attorney’s Fees
¶ 42. At the time of the proceedings in June 2008, Joseph had already paid $4,500 in attorney’s fees. The chancellor awarded Lauren an additional $15,500 in attorney’s fees. Joseph contends that the chancellor failed to properly consider the McKee factors and applicable law governing the award of attorney’s fees and to enter specific findings of fact and conclusions of law based on each factor. See McKee v. McKee, 418 So.2d 764, 767 (Miss.1982).
¶ 43. In divorce matters, the decision whether to award attorney’s fees is generally entrusted to the sound discretion of the chancellor. Tynes v. Tynes, 860 So.2d 325, 331 (¶ 22) (Miss.Ct.App.2003). Unless the chancellor abuses his discretion, his decision will generally be upheld. Ladner v. Ladner, 436 So.2d 1366, 1375 (Miss.1983). “It is the function of the chancellor to weigh all of the facts and assess the circumstances and to award attorney’s fees accordingly.” O’Neill v. O’Neill, 501 So.2d 1117, 1119 (Miss.1987). This Court held in East v. East that an award of attorney’s fees is appropriate, after examination of the McKee factors, when the only liquid asset was the alimony award and the party seeking fees has otherwise demonstrated an inability to pay the fees. East v. East, 775 So.2d 741, 747 (¶ 16) (Miss.Ct.App.2000).
¶44. The appropriate amount of attorney’s fees is determined by a sum sufficient to secure one competent attorney, the relative financial ability of the parties, the skill and standing of the attorney employed, the nature of the case and novelty and difficulty of the questions at issue, the degree of responsibility involved in the management of the cause, the time and labor required, the usual and custom *866 ary charge in the community, and the preclusion of other employment by the attorney due to the acceptance of the case. McKee, 418 So.2d at 767.
¶ 45. The chancellor indicated that awarding the additional attorney’s fees of $15,000, totaling $20,000, was appropriate considering the complexity of the case and the length of time both attorneys dedicated to resolve this dispute. The following dialogue sheds light on the chancellor’s explanation of awarding attorney’s fees in this case:
THE COURT: Now, what about attorneys’ fees?
MR. RATLIFF: Yes, sir. Your Honor, the law is that—
THE COURT: Well, I haven’t seen any. How much attorneys’ fees did you ask for?
MR. RATLIFF: Well, we asked for them but we haven’t calculated our bill through today. We can do that and submit that to the Court.
THE COURT: I need to know that now.
MR. LOWREY: Your Honor, attorneys’ fees, if I may, are only payable if in fact she can’t afford it. You have just made her able to afford it. You have just made her able to afford it. Now, with the testimony which previously is that we — Joseph had already paid a $4,500, amount to her attorneys’ fees. There’s no bill. They can’t reopen the case. There’s been no submission of attorneys’ fees.
THE COURT: Well, they asked for them. They did ask for them.
MR. LOWREY: They may have asked for them, but they didn’t prove them.
MR. LOWREY: No, they didn’t ask for them.
MR. KLEIN: Yes, we did.
THE COURT: We know they have attorneys’ fees.
MR. LOWREY: I didn’t — no, it’s not a question of we know that they have attorneys’ fees.
THE COURT: Well, here’s what I’m going to do. I’m going to award an additional $15,500 in attorneys’ fees to cover her attorneys’ fees. It will be $20,000. I suspect they will exceed $20,000, but that’s the amount I’m going to go.
MR. RATLIFF: Yes, sir.
MR. LOWREY: Your Honor, are you taking into consideration of what one lawyer would do or are you combining both the lawyers because it should be— the case law is absolutely clear that it’s based on one reasonable attorney’s fees. That will make it $20,000—
THE COURT: I think the nature of the case, the complexity of the case, all the work they had to do to try to get to the bottom of the assets and everything, I’ve taken all that into consideration and I’ve weighed it, and I believe the attorney’s fees would exceed $20,000, so that’s my ruling.
¶ 46. Review of the record indicates that the only factors that the chancellor addressed in his ruling to award attorney’s fees to Lauren was the fact that this case was complex and that the attorneys involved labored extensively to determine the assets and etc., regarding this case. Without more, we find that the chancellor’s decision to award attorney’s fees should be reversed and remanded for proper determination of the amount of attorney’s fees to be awarded using the appropriate factors outlined in McKee.
¶ 47. THE JUDGMENT OF THE CHANCERY COURT OF LAMAR COUNTY IS AFFIRMED IN PART AND REVERSED AND REMANDED IN PART FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPIN *867 ION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ISHEE, ROBERTS AND MAXWELL, JJ., CONCUR. CARLTON, J., NOT PARTICIPATING.

. Mississippi Rule of Appellate Procedure 28(a)(6) states: “[t]he argument shall contain the contentions of appellant with respect to the issues presented, and the reasons for those contentions, with citations to the authorities, statutes, and parts of the record relied on.”