ISHEE, J,
for the Court:
¶ 1. In August 2010, Steven Anthony Cupp (Steve) and Jennifer Gray Cupp (Jenny) were married in DeSoto County, Mississippi. They resided there until their separation in Tennessee in June 2011. Jenny initially filed for divorce based on habitual cruel and inhuman treatment, but the parties eventually agreed to an irreconcilable-differences divorce. They submitted the issues of property classification and division of the marital estate, among other issues, to the DeSoto County Chancery Court. After the chancery court entered its final judgment, Steve filed an appeal. Finding no error, we affirm.
STATEMENT OF FACTS
¶2. Immediately following the parties’ wedding in August 2010, Steve and Jenny, along with Jenny’s son from a prior relationship, lived in a home Steve had purchased prior to the marriage in Lake Cormorant, Mississippi. Steve purchased the home for a total of $123,000, making a $7,000 down payment and paying for the remainder through a mortgage. Shortly after the wedding, the couple decided to move to Sevierville, Tennessee. Steve left for Sevierville ahead of Jenny to make business and home plans for the couple.
¶ 3. Steve, a former auto-collision-repair worker, developed medical conditions just prior to the marriage, which caused his doctor to recommend that he leave the auto industry. He started an unsuccessful vehicle-graphics business that ended shortly after the couple wed. Thereafter, Steve moved to Sevierville with plans to open a souvenir shop.
¶ 4. Steve had inherited approximately $170,000 from his mother’s estate. He used the funds to relocate and rent a home and office space. He also used the money to buy items for the shop, including a $9,985 laser printer, among other things. Steve states that he spent the majority of his inheritance on the business. The business eventually failed, and by 2012, the balance in Steve’s separate account containing his inheritance from his mother was approximately $2,600.
¶ 5. Jenny, who has an associate’s degree and has worked as a legal secretary and paralegal, was working as a teacher’s assistant in DeSoto County at the time of *113 the marriage. In 2011, Jenny earned approximately $1,450 a month. Due to Steve’s numerous changes in employment, Jenny had him listed on her employer’s health insurance during the course of the marriage.
¶ 6. A few weeks after the couple married, Steve purchased a 2005 Honda Odyssey van for Jenny using funds from his separate account. The van is valued at approximately $13,000. Steve owns a 2000 Chevrolet Silverado truck valued at $3,000 that he acquired before he married Jenny. Jenny entered the marriage with a 2001 Toyota Camry, which she sold in May 2011 for $4,500. The funds from the sale of the 2001 Toyota Camry were deposited into the couple’s joint account.
¶ 7. In June 2011, the couple separated. Steve alleges that just prior to the separation, Jenny transferred approximately $6,450 from Steve’s separate account into their joint account. Although Jenny did not have permission to access his separate account, Steve asserts that she contacted his ex-wife and others to determine his user name, password, and the answer to the account’s security question. Around May 2011, Jenny withdrew the $4,500 from the sale of her vehicle from their joint account and closed the account. Aside from $1,500 Jenny admitted to having contributed to rent for the home and business in Sevierville, the record indicates she used the funds in the joint account for her personal expenses only during the nine-month marriage.
¶ 8. After Jenny filed for divorce on the ground of habitual cruel and inhuman treatment, the couple finally agreed to an irreconcilable-differences divorce. They submitted property classification and division of their marital estate to the chancery court. In September 2011, prior to the trial, the chancellor ordered that Jenny reinstate and maintain Steve on her employer’s insurance. However, because of Steve’s prior medical conditions, Jenny claims it was financially impossible for her to reinstate retroactive coverage on her salary. Additionally, Steve claims Jenny’s offer to extend him COBRA coverage was hollow since the insurance would be useless to him since he lives out of state.
¶ 9. After a January 2012 trial on the merits, the chancellor determined that Steve was the primary financial contributor but that Jenny made significant domestic contributions to the marriage. The chancellor ruled that the 2005 Honda Odyssey van valued at $13,000, a 2010 income-tax refund of $7,472.55, the $9,985 laser printer, and the equity in the Lake Cormorant home minus the money Steve used as a down payment on the home were all part of the marital estate. The total of the marital estate was valued at $43,467.55.
¶ 10. In dividing the assets, the chancery court ordered that Jenny receive exclusive use and possession of the $13,000 2005 Honda Odyssey van. The chancery court also determined that in order to avoid lump-sum alimony, Jenny was entitled to the couple’s 2010 income-tax refund of $7,472.55. Jenny’s award was approximately $20,472.55.
¶ 11. Steve appeals the chancery court’s determination. He asserts that the Lake Cormorant home should not have been deemed part of the marital estate due to the brevity of the couple’s marriage and Jenny’s lack of financial contribution to the home. Steve argues that because the couple did not bear children to raise in the home, Jenny’s domestic contribution to the home is so minimal as to remove the home from the marital estate.
¶ 12. He also argues that the chancery court failed to account for approximately $11,000 that he claims Jenny reallocated *114 from his separate account and their joint account prior to the couple’s separation. Steve asserts that Jenny deposited about $4,500 into their joint account after she sold her 2001 Toyota Camry and then removed the funds from the account without explanation. He also claims that Jenny gained unauthorized access to his separate account and stole several thousand dollars from him. He asserts that the chancellor should have accounted for this money when equitably dividing the estate.
¶ 13. On appeal, Steve also argues that Jenny was not entitled to the 2010 tax refund because the record reflects her contribution to the reported $57,397 in income in 2010 was only $10,609. Furthermore, Steve notes that most of the refund was attributable to $17,654 in Steve’s reported business losses. Additionally, Steve claims the chancellor’s award was essentially an award of lump-sum alimony, which exceeded the scope of the chancellor’s authority in adjudicating the couple’s irreconcilable-differences divorce.
¶ 14. Steve next makes a general argument that the chancellor erred in his Ferguson[1] analysis with regard to the aforementioned issues. Finally, Steve argues the chancellor erred by failing to address Steve’s lack of health insurance. Jenny never provided Steve the health insurance ordered by the chancery court in its September 2011 order. However, again, Jenny claims an impossibility of performance due to Steve’s preexisting conditions.
STANDARD OF REVIEW
¶ 15. When reviewing domestic-relations matters, we are confined to a limited standard of review. See, e.g., Ferguson v. Ferguson, 639 So.2d 921, 929 (Miss.1994). The Mississippi Supreme Court has held that a chancellor’s findings of fact, particularly in domestic-relations cases, “will generally not be overturned by this Court on appeal unless they are manifestly wrong.” Fancher v. Pell, 831 So.2d 1137, 1140 (¶ 15) (Miss.2002) (citing Nichols v. Tedder, 547 So.2d 766, 781 (Miss.1989)). The chancellor must have been “manifestly wrong, clearly erroneous[,] or an erroneous legal standard [must have been] applied,” for the findings to be overturned. Montgomery v. Montgomery, 759 So.2d 1238, 1240 (¶ 5) (Miss.2000) (citation omitted).
DISCUSSION
I. Marital Home
¶ 16. We first address Steve’s argument that the chancellor erred in classifying the Lake Cormorant property as marital, and, therefore, the property should not have been included in the division of marital assets. Steve asserts that because he acquired the property prior to the marriage, titled the property solely in his name, and made mortgage payments from his separate account, that the property is not marital in nature. Jenny counters Steve’s claims by noting that she lived in the home with her son and Steve before Steve moved to Sevierville. At that time, Jenny contributed domestically to all maintenance on the home for a number of months until she joined Steve in Sevier-ville.
¶ 17. Mississippi employs the family-use doctrine when determining whether a couple’s separate property has become marital due to the family’s use of the property. See, e.g., Stewart v. Stewart, 864 So.2d 934, 937-38 (¶ 13) (Miss.2003); Rhodes v. Rhodes, 52 So.3d 430, 438 (¶¶ 25-26) (Miss.Ct.App.2011); Brame v. Brame, 98-CA-00502-COA (¶ 20) (Miss.Ct.App. Mar. 28, 2000), rev’d in part on other grounds, 796 So.2d 970 (Miss.2001). *115 Property that was acquired prior to the marriage by one of the parties can become marital property when used by the family. See id. Furthermore, a party’s contribution to the maintenance of a family home, whether monetary or physical, is considered when dividing the home equitably. See, e.g., Ferguson, 639 So.2d at 928; Hemsley v. Hemsley, 639 So.2d 909, 915 (Miss.1994); Tatum v. Tatum, 54 So.3d 855, 861 (¶ 21) (Miss.Ct.App.2010).
¶ 18. The record reflects that the chancellor determined that the property in question was converted to a marital asset by means of the family-use doctrine. The chancellor also noted “that while [Steve] made the primary financial contributions to the accumulation of marital assets, [Jenny] made significant domestic contributions to the marriage.” We agree. Steve, Jenny, and Jenny’s son all lived in the home for some time prior to their move to Sevierville. Jenny also physically maintained the home by herself for several months after Steve moved. We cannot find manifest error in the chancellor’s determination that the Lake Cormorant property was part of the marital estate. This issue is meritless.
II. Reallocation and Dispersion of Funds
¶ 19. We next address Steve’s argument that the chancellor failed to account for money Jenny allegedly reallocated from Steve’s separate account and the couple’s joint account. At trial, Jenny admitted to transferring certain funds from Steve’s separate account into the joint account. However, Jenny testified that on one occasion, Steve instructed her to transfer approximately $1,500 into their joint account to cover household expenses, and on another occasion, Steve instructed her to transfer money to cover purchases he had made for his souvenir shop in Sevi-erville. Jenny asserted that the passwords to both Steve’s separate account and their joint account were the same. Steve contradicted this testimony and stated that the passwords were not the same, and that Jenny was never given authorization to access his account. Steve asserts that Jenny stole money from his account, transferred it into their joint account, and then withdrew the money. Furthermore, both parties admit that the proceeds from the sale of Jenny’s 2001 Camry were deposited in the joint account. They agree that the deposited amount was $4,500. However, they disagree as to how the funds were spent. In sum, Steve alleges that Jenny withdrew the money while Jenny claims she paid household bills with the money.
¶ 20. It is well-settled law that “in a divorce proceeding, the chancellor is the finder of fact, and the assessment of witness credibility lies within his sole province.” McFarland v. McFarland, 105 So.3d 1111, 1116 (¶ 12) (Miss.2013) (citation omitted). It was within the chancellor’s authority to determine whose testimony was more credible. We will not invade the chancellor’s province by questioning his assessment of the parties’ credibility with regard to transferred funds and the funds from the sale of Jenny’s vehicle. This issue is without merit.
III. Tax Refund
¶ 21. Steve’s next issue on appeal concerns the chancellor’s award of the couple’s 2010 joint tax refund. The chancellor granted Jenny the refund of $7,472.55. Steve asserts this award was a de facto award of lump-sum alimony, which he claims the chancellor was unauthorized to make.
¶ 22. The record indicates that the couple consented to allow the chancery court to resolve lingering issues in their irreconcilable-differences divorce. The remaining *116 issues included division of marital and personal property, as well as Steve’s claim of contempt against Jenny for failing to provide him with health insurance. Steve argues that because an award of alimony was not an issue presented to the chancery court, the chancellor acted outside the scope of their consent by awarding the tax refund to Jenny.
¶ 23. However, the chancellor did not award the tax refund as alimony. The chancellor stated, “By awarding Mrs. Cupp the income[-]tax refund and the Honda minivan[,] the [c]ourt will not have to award rehabilitative alimony, which would be a potential source of future friction between the parties.” This was stated immediately after the chancellor completed his Ferguson analysis. The award of the tax refund to Jenny appears to be merely a continuation of the chancellor’s attempt to equitably divide the marital estate such that alimony would not be required. This issue is meritless.
IV. Ferguson Analysis
¶ 24. Steve asserts that the chancellor erred in his Ferguson analysis when dividing the marital estate. However, all of Steve’s issues with regard to the Ferguson analysis have been addressed above. As such, our determination that Steve’s aforementioned issues lack merit is dispositive of his claim regarding the chancellor’s Ferguson analysis.
V. Contempt
¶25. Finally, Steve claims that the chancellor erred in failing to find Jenny in contempt of court for declining to provide Steve with court-ordered health insurance. Jenny counters Steve’s claim with a defense of impossibility. Jenny asserts that obtaining the insurance in question was cost-prohibitive to her.
¶ 26. The Mississippi Supreme Court has held that “[e]ven when there has been established a prima facie case of contempt, the defendant may avoid judgment of contempt by establishing that he is without present ability to discharge his obligation.” Newell v. Hinton, 556 So.2d 1037, 1044 (Miss.1990) (citation omitted). Here, Jenny attempted to reinstate Steve on her employer’s health-insurance policy after the couple separated. However, her testimony at trial revealed that it would cost approximately $418 a month for his health insurance. She further testified that her average net monthly paycheck was approximately $520 a month, but that there were months where her paycheck would be less than $300 a month due to holiday or seasonal school closings.
¶ 27. We cannot find that the chancellor committed manifest error in failing to hold Jenny in contempt of court. Particularly since Jenny has a child to support, it would be nearly impossible for her to pay for Steve’s health insurance and provide basic necessities for herself and her son with the leftover income from her paycheck. During some months, it appears that it would be absolutely impossible for Jenny to even cover the premium payment on the health insurance, much less provide for her child. This issue is without merit.
¶ 28. THE JUDGMENT OF THE DE-SOTO COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ROBERTS, CARLTON, MAXWELL AND FAIR, JJ., CONCUR. JAMES, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION.

. Ferguson v. Ferguson, 639 So.2d 921 (Miss.1994).