# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-CA-01724-COA

PAUL V. LACOSTE                                                APPELLANT

v.

LAURA R. LACOSTE                                             APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 03/20/2014 |
| TRIAL JUDGE: | HON. CYNTHIA L. BREWER |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | J. PEYTON RANDOLPH II<br>RICK D. PATT |
| ATTORNEYS FOR APPELLEE: | WILLIAM R. WRIGHT<br>E. FOLEY RANSON<br>SARAH ANN ELLIS |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| TRIAL COURT DISPOSITION: | GRANTED APPELLEE DIVORCE, AWARDED CHILD CUSTODY AND SUPPORT, DIVIDED MARITAL PROPERTY, AND AWARDED REHABILITATIVE ALIMONY AND ATTORNEY'S FEES |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND REMANDED IN PART - 07/19/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE LEE, C.J., BARNES AND ISHEE, JJ.**

**BARNES, J., FOR THE COURT:**

¶1. Laura Lacoste was granted a divorce from Paul Lacoste based on habitual cruel and inhuman treatment. Laura was granted sole custody of the couple's two children, and Paul was ordered to pay rehabilitative alimony and child support. Paul appeals, arguing the chancellor erred in awarding Laura sole physical and legal custody of the children, erred in

reducing his visitation schedule, erred in determining child support and alimony, and erred in refusing to consider newly discovered evidence posttrial. We find no error and affirm as to these issues. Paul also argues the chancellor erred in valuing his business and, consequently, erred in dividing the marital property. We agree the chancellor's ruling on Paul's business valuation was in error. Therefore, we reverse and remand for further proceedings as to the valuation of Paul's business. Because we remand on this issue, we likewise remand for the chancellor to revisit the equitable distribution of property, since it hinged on the business's valuation.

**FACTS**

¶2. Paul and Laura were married in April 2006 and separated in December 2012. Two children were born of the marriage, Cannon and Cole, who were six and three at the time of trial. On January 2, 2013, Paul filed for a divorce in the Madison County Chancery Court on the grounds of habitual cruel and inhuman treatment and, alternatively, irreconcilable difference. Laura counterclaimed for a divorce based on habitual cruel and inhuman treatment, constructive desertion, and, alternatively, irreconcilable differences. Laura later amended her counterclaim to add adultery as a ground for divorce.

¶3. On March 20, 2014, Laura was granted a divorce from Paul on the ground of habitual cruel and inhuman treatment. The chancellor ordered Paul to pay $1,000 monthly in rehabilitative alimony for twenty-four months. Laura was awarded sole custody of the couple's children, and Paul was granted visitation. Paul was ordered to pay $4,280 in child support monthly, as well as the remainder of the older child's private-school tuition for the

2

2013-2014 school year. School and childcare expenses were ordered to be divided equally after that. Paul was ordered to provide health and hospitalization insurance for the children, and both Paul and Laura were ordered to maintain life-insurance policies with the children as beneficiaries. For tax purposes, Paul was allowed to claim the children as dependents from 2014-2016 and every even-numbered year thereafter. Laura was awarded ownership of the marital home, her vehicle, two bank accounts, the children's college trust accounts, and various personal property. Paul received all interest in his business, Next Level Sports LLC (NLS), also known as Paul Lacoste Sports—a fitness training company owned and operated by Paul—his vehicle, two bank accounts, and various personal property. After the division of property, Paul was ordered to pay Laura $73,000 within ten years for her interest in the marital estate. Paul was also ordered to pay $5,000 toward Laura's attorney's fees.

¶4. On March 28, 2014, Paul filed a motion for a new trial and to clarify and amend the chancellor's opinion and final judgment. Laura filed a motion for reconsideration. A hearing was held on November 14, 2014, following which the chancellor denied both motions. However, the chancellor entered an order clarifying certain aspects of the final judgment related to the children's school expenses—specifically, that Paul was not required to pay all private-school tuition beyond the 2013-2014 school year; rather, Paul would pay half of the children's education in either public or private school, and college tuition would be capped at the cost of an in-state public four-year Mississippi university.

¶5. Paul now appeals, raising five issues: (1) the trial court erred in awarding Laura sole physical and legal custody of the couple's children and erred in limiting his visitation; (2) the

3

trial court erred in calculating child support; (3) the trial court erroneously valued NLS and used the erroneous valuation to calculate alimony and divide the marital property; (4) the trial court failed to consider Laura's posttrial actions that affected child custody and support, and the posttrial tax consequences of Laura's liquidation of her retirement account; and (5) cumulative error warrants reversal.

## STANDARD OF REVIEW

¶6.     We review a chancellor's factual findings for abuse of discretion. *McNeil v. Hester*, 753 So. 2d 1057, 1063 (¶21) (Miss. 2000). "The findings of a chancellor will not be disturbed on review unless the chancellor was manifestly wrong [or] clearly erroneous, or applied the wrong legal standard." *Id.* Questions of law are reviewed de novo. *Id.*

## DISCUSSION

### I.     Child Custody and Visitation

#### A.     Award of Sole Physical and Legal Custody to Laura

¶7.     Paul argues that the chancellor abused her discretion in awarding Laura sole physical and legal custody of the couple's two children.

¶8.     When determining child custody, the chancellor must consider the factors set out in *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983). The *Albright* factors are: (1) the children's age, health, and sex; (2) continuity of care prior to the separation; (3) parenting skills and willingness and capacity to provide primary child care; (4) the employment of the parents and responsibilities of that employment; (5) the physical and mental health and age of the parents; (6) the emotional ties of the parents and children; (7) the moral fitness of the

4

parents; (8) the children's home, school, and community record; (9) the preference of the children at the age sufficient to express a preference by law; (10) the stability of the home environment and employment of each parent; and (11) other factors relevant to the parent-child relationship. *Id.*

¶9. The polestar consideration in child-custody cases is the best interest of the child. *Id.* "[T]he chancellor has the ultimate discretion to weigh the evidence the way [she] sees fit." *Johnson v. Gray*, 859 So. 2d 1006, 1013-14 (¶36) (Miss. 2003). "So long as there is substantial evidence in the record that, if found credible by the chancellor, would provide support for the chancellor's decision, [we] may not intercede simply to substitute our collective opinion for that of the chancellor." *Bower v. Bower*, 758 So. 2d 405, 412 (¶33) (Miss. 2000).

¶10. The chancellor analyzed the *Albright* factors and found the following factors neutral: the children's age, health, and sex; physical and mental health and age of the parents; emotional ties of parents and children; and the stability of the home environment and employment of each parent. The children's preferences were not applicable due to their young ages. The chancellor found the remaining factors favored Laura. No "other factors" were considered. Paul takes issue with the chancellor's findings on two *Albright* factors: continuity of care; and the home, school, and community record of the children.

¶11. First, Paul argues that the chancellor's finding that the continuity-of-care factor strongly favored Laura was manifestly wrong and clearly erroneous. He points to the chancellor's own language in the final judgment, which details Paul's involvement with the

5

children: "Paul planned outings for the children and actively participated in sports events, school events, teacher conferences, birthday parties, and medical care of the children through the parties' marriage and year-long separation." While it is undisputed that Paul was an involved parent, the evidence nonetheless overwhelmingly supports the chancellor's finding that this factor favored Laura. The testimony showed that Laura was the children's primary caregiver during the marriage and after the separation. Laura did not work outside the home. She cared for the children while Paul worked approximately fourteen hours a day. Laura testified that prior to and after the separation, she picked the children up from school, prepared their meals, bathed them, put them to bed, got up with them at night, provided discipline, and spent more time with them. She testified she scheduled and took the children to all doctor's appointments. She also stated she was actively involved in Cannon's school and extracurricular activities, and she coached Cannon's soccer team.

¶12. Paul argued that he was more concerned and attentive regarding Cole's medical needs, and that Laura relied on babysitters and had called him home from work several times to help with the children. Laura testified that this was untrue; rather, Paul used this as an excuse in order to stay home to work on their marriage.

¶13. While both parties presented corroborating witnesses, the chancellor gave greater weight to "Laura's credibility, her role as primary caregiver prior to and after their separation, and her corroborating witnesses." Weighing "[t]he evidence and credibility of a witness is the sole responsibility of the chancellor[.]" *Mabus v. Mabus*, 890 So. 2d 806, 816 (¶38) (Miss. 2003). "[T]he chancellor, by [her] presence in the courtroom, is best

6

equipped to listen to witnesses, observe their demeanor, and determine [their] credibility . . . and what weight ought to be ascribed to the evidence given by those witnesses." *Id.* at 819 (¶56). We find the chancellor did not abuse her discretion in finding this factor strongly favored Laura.

¶14. Next, Paul argues that the chancellor erred in finding the children's home, school, and community record favored Laura. Both parties lived in Madison County. Paul argues there was ample testimony that both parents were involved in the children's school and extracurricular activities and had extended family and support systems nearby, and the children had a good quality of life, strong family bonds, and access to quality schools. Based on this, Paul argues the chancellor should have found this factor neutral. The chancellor considered both parents' involvement and nearby extended family. But the chancellor also considered that Laura's sister lives with her and helps care for the children. Given Laura's home environment, the chancellor found this factor favored Laura. The chancellor's decision is supported by the substantial evidence. Therefore, we find no abuse of discretion in the chancellor's finding that this factor favored Laura.

### B. Laura's Alleged Move

¶15. Paul argues that after the chancellor's decision was entered, Laura moved to the Gulf Coast. He argues that because Laura has moved, the chancellor's findings on certain *Albright* factors are no longer applicable, as they hinged on Laura's living in Madison County.

¶16. Paul attempted to introduce evidence of Laura's alleged move during the hearing on

7

his motion for a new trial. However, the chancellor excluded the evidence, finding it more appropriate for a modification action. As will be discussed in more detail in issue four, we cannot find the chancellor erred in doing so. The chancellor correctly based her decision on child custody on the facts available at the time of trial, and we find no error in her findings.

### C. Lack of Findings on Joint Custody

¶17. Paul argues that the chancellor's award of sole legal and physical custody of the children to Laura cannot be upheld since the chancellor failed to articulate why joint custody was not considered.

¶18. In support of his argument, Paul cites the holding in *Crider v. Crider*, 904 So. 2d 142, 147 (¶13) (Miss. 2005), which states that "unless the parents are capable of sharing joint custody cooperatively, it is incumbent upon a chancellor not to award joint custody." However, we find nothing in *Crider* requiring the opposite—that is, *Crider* does not require an award of joint custody if the parties are capable of sharing custody cooperatively. Likewise, we find nothing requiring the chancellor to make written findings on joint custody when another option is chosen.

¶19. Paul and Laura each alleged fault-based grounds for divorce, and Laura was ultimately granted a divorce based on habitual cruel and inhuman treatment. While Paul argues nothing in the chancellor's findings precluded an award of joint custody, it was clear from the record that the parties could not get along during the marriage and had difficulty communicating during their separation. The chancellor found it in the children's best interest to grant sole legal and physical custody to Laura. The chancellor provided a factual basis for her decision,

8

and her decision was supported by the substantial evidence. This issue is without merit.

### D.    Reduced Visitation Schedule

¶20.    Paul next argues that the chancellor abused her discretion in reducing his visitation schedule from that set in the temporary order, since Laura agreed that the prior visitation schedule "work[ed] fine." The temporary visitation schedule gave Paul visitation every other weekend from Thursday at 4:30 p.m. through Sunday at 5 p.m., and midweek visitation from 4:30 p.m. through 8 p.m. on Thursday during the weeks prior to his regular weekend visitation, absent another agreement by the parties as to the day and time of the midweek visitation. The visitation schedule set out in the chancellor's final opinion granted Paul visitation every other weekend from Friday at 4:30 p.m. through Sunday at 6 p.m. No midweek visitation was granted. The final opinion also established a holiday and summer visitation schedule, which had not been set out in the temporary order.

¶21.    Regarding Paul's argument that the chancellor erroneously took away his Thursday and midweek visitation, we note that Laura testified that Paul did not exercise the Thursday visitation as set out in the temporary order, even though she had encouraged him to do so. A chancellor has broad discretion in establishing an appropriate visitation schedule. *Rushing v. Rushing*, 724 So. 2d 911, 917 (¶27) (Miss. 1998). "In determining visitation, the chancellor must continue to 'keep the best interest of the child as his paramount concern while always being attentive to the rights of the non[]custodial parent, recognizing the need to maintain a healthy, loving relationship between the non[]custodial parent and his child.'" *Id.* (quoting *Harrington v. Harrington*, 648 So. 2d 543, 545 (Miss. 1994)). The chancellor

9

did not limit Paul's visitation to only those times set out in the schedule, but stated that the visitation schedule was "[i]n addition to any periods of visitation which are agreed upon by the parties[.]" We cannot find the chancellor abused her discretion in setting the visitation schedule, especially as there was evidence that Paul did not exercise his Thursday visitation rights.

## II. Child Support

¶22. The chancellor awarded child support by applying the statutory guideline of twenty percent to Paul's adjusted gross income as reported in his Uniform Chancery Court Rule 8.05 financial statement. This resulted in a child-support award of $4,280 a month. Paul argues the chancellor's application of the statutory twenty-percent guideline was error for three reasons. First, he asserts the chancellor failed to make written findings on whether the statutory guidelines were applicable, since his income exceeded $100,000. Second, he argues the chancellor failed to consider fluctuations in his income. Third, he argues the chancellor failed to take into consideration that he was ordered to pay additional expenses for the children that should have reduced the monthly child-support award.

### A. Written Findings on Application of Statutory Guidelines

¶23. The child-support guidelines set out in Mississippi Code Annotated section 43-19-101(1) (Rev. 2015) create a rebuttable presumption regarding the percentage of adjusted gross income that should be awarded for child support. The guideline for two children is twenty percent. *Id.* However, Mississippi Code Annotated section 43-19-101(4) (Rev. 2015) states that when a paying party's adjusted gross income is more than $100,000

or less than $10,000, "the court shall make a written finding in the record as to whether or not the application of the guidelines established in this section is reasonable."

¶24. The chancellor recognized that she was not confined by the guidelines since Paul's income exceeded $100,000. After review, though, she found "that the application of the guidelines in this case is reasonable in light of the facts and circumstances." Paul argues this statement alone, without additional explanation, was insufficient to satisfy the statute's "written finding" requirement.

¶25. Paul's argument is similar to the appellant's argument in *Peters v. Peters*, 906 So. 2d 64, 72 (¶35) (Miss. Ct. App. 2004). Like Paul, the appellant in *Peters* argued that the chancellor's findings failed to comply with the statute's written-finding requirement. *Id.* The chancellor's entire written findings stated: "The [c]ourt recognizes that the gross annual income stated herein exceeds the [statutory maximum]. At this point in time, however, the [c]ourt sees no reason to deviate from the statutory child support guideline of twenty percent of the adjusted gross income." *Id.* at (¶36). We found that while "rather succinct," the chancellor's statement was "nonetheless a written finding of reasonableness," and, when viewed in context of the chancellor's findings as a whole, was sufficient to comply with the requirements of section 43-19-101(4). *Peters*, 906 So. 2d at 72 (¶36).

¶26. We find the same to be true here. The chancellor detailed her findings on the parties' finances in great detail in her thirty-four-page opinion. Laura listed her expected monthly living expenses for herself and the children as $15,291.76. Paul listed his and the children's monthly living expenses as $20,634.85. The chancellor considered that Paul's monthly

expenses would decrease after the divorce by least $3,585.42, since he would no longer be responsible for the mortgage or utilities on the marital home or Laura's car payment. The chancellor also considered that Paul's earning potential was much greater than Laura's. Viewed as a whole, we find the chancellor's findings sufficient to support the adherence to the statutory guidelines. This issue is without merit.

### B. Fluctuations in Income and Other Obligations

¶27. Mississippi Code Annotated section 43-19-103(d) and (h) (Rev. 2015) states that the rebuttable presumption of the statutory guidelines may be overcome if "the application of the guidelines would be unjust or inappropriate" due to "[s]easonal variations in one or both parents' incomes or expenses" or the "[t]otal available assets of the obligee, obligor and the child."

¶28. Paul argues that in applying the statutory guideline of twenty percent for child support, the chancellor failed to consider income fluctuations in his business. For example, Paul points out that in 2013, he had a training camp on the Gulf Coast, which was sponsored in large part by Biloxi Regional Medical Center, and the sponsorship would not be continued due to the death of a participant. He states that it was "uncontradicted . . . that his income would likely be lower the next year due to the discontinuation of the Coast operations." We are not persuaded by Paul's argument regarding decreases in his business. While it is true that Paul's business fluctuates, he has been able to reinvent his company to continue its profitability. For example, in 2010, NLS's net profit was $190,718. In 2011, the net profit was $462,573. In 2012, the net profit was $223,355. Paul testified the 2011 increase was

12

based on a substantial sponsorship from Blue Cross Blue Shield, which would not be repeated. However, in 2013, Paul again had a large sponsorship—this time from Biloxi Regional. This shows that while Paul may lose one sponsorship, another may be gained. Thus, the business will continue to fluctuate. The chancellor recognized Paul's income fluctuations and still found it appropriate to apply the statutory guidelines for child support. We find no abuse of discretion in her decision.

### C. Additional Expenses

¶29. Paul argues that the chancellor failed to consider that he was ordered to pay Cannon's outstanding school expenses for 2013-2014, and to split all education, childcare, and extracurricular expenses with Laura after that. He was also ordered to pay for health, hospitalization, and dental insurance for the children and to pay equally amounts not covered by insurance. Paul was also ordered to maintain a minimum $2 million life-insurance policy. He argues these expenses are in essence child support and should have reduced the monthly award. He further argues that the chancellor failed to consider that he was ordered to pay Laura $73,000 over ten years as part of the equitable division of marital property. Paul asserts that these expenses will reduce his monthly available funds, and, therefore, should have reduced the monthly child-support award.

¶30. While a chancellor may reduce child support in light of other financial obligations, the chancellor is not required to do so. Rather, it is well settled that additional obligations may be awarded above the basic child-support award. "Parents may be ordered to pay additional amounts over and above child support for additional expenses such as 'health

13

insurance, out-of-pocket medical and other health-related expenses, life insurance, and expenses of a college education.'" Deborah H. Bell, *Mississippi Family Law* § 10.07 (1st ed. 2005) (quoting *Nichols v. Tedder*, 547 So. 2d 766, 769 (Miss. 1989)). Therefore, we cannot find the chancellor erred in awarding these additional obligations on top of basic support.

### III. Equitable Division and Alimony

#### A. Business Valuation

¶31. Paul argues that the chancellor inaccurately valued NLS and that this led to an inequitable distribution of the marital property. Paul does not dispute the chancellor's classification of NLS as a marital asset.

¶32. "When the parties request that the chancellor resolve the issue of property division, the chancellor must do three things: (1) classify the parties' assets as marital or separate, (2) value those assets, and (3) divide the marital assets equitably." *Burnham v. Burnham*, 185 So. 3d 358, 361 (¶12) (Miss. 2015). Equitable division of property is governed by the factors set out in *Ferguson v. Ferguson*, 639 So. 2d 921, 929 (Miss. 1994):

    1.    Substantial contribution to the accumulation of the property. Factors to be considered in determining contribution are as follows:

        a.    Direct or indirect economic contribution to the acquisition of the property;

        b.    Contribution to the stability and harmony of the marital and family relationships as measured by quality, quantity of time spent on family duties and duration of the marriage; and

        c.    Contribution to the education, training or other accomplishment bearing on the earning power of the spouse accumulating the assets.

2. The degree to which each spouse has expended, withdrawn or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree or otherwise.

3. The market value and the emotional value of the assets subject to distribution.

4. The value of assets not ordinarily, absent equitable factors to the contrary, subject to such distribution, such as property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse;

5. Tax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution;

6. The extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties;

7. The needs of the parties for financial security with due regard to the combination of assets, income and earning capacity; and,

8. Any other factor which in equity should be considered.

¶33. Paul began NLS in 2005, the year before he and Laura were married. Laura's background is as a personal trainer. She worked with Paul to start and build NLS. The testimony showed that during the first few years of the marriage, Laura helped manage the company. She sent emails and developed the website. For a short period of time, she wrote checks, helped with bookkeeping, attended meetings, and gave physical-therapy advice to Paul's clients. She opened a booth at Interior Spaces, but in 2012 it generated no income. Other than these activities, Laura did not work outside the home and was the children's primary caretaker. The chancellor considered that although Paul's work at NLS substantially contributed to the accumulation of marital assets, Paul's behavior and misconduct negatively

15

impacted the marriage. The chancellor also considered Paul's wasteful dissipation of $3,170.07 of marital assets, which he spent on his new girlfriend. The chancellor determined that Paul should be awarded one hundred percent of NLS, and Laura should be compensated through equitable distribution of the remaining marital property.

¶34. Because NLS was the couple's main asset and source of income, an accurate business valuation is vital for an equitable distribution of the couple's property. *Ferguson* factor three requires the chancellor to determine the market value of assets subject to distribution. *Id.* Three approaches may be used in determining the market value of a business for equitable-distribution purposes: (1) an asset-based approach, in which assets and liabilities are evaluated, (2) a market-based approach, in which the market is surveyed for similar sales, or (3) an income-based approach, in which a value is placed on earning potential. *Singley v. Singley*, 846 So. 2d 1004, 1011 (¶18) (Miss. 2002).

> [R]egardless of what method an expert might choose to arrive at the value of a business, the bottom line is one must arrive at the "fair market value" or that price at which property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of the relevant facts.

*Id.* Goodwill is excluded when "valuing a business for distribution as marital property in a domestic case." *Id.* "[G]oodwill is simply not property; thus it cannot be deemed a divisible marital asset in a divorce action." *Id.*

¶35. While "expert testimony may be essential to establish valuation sufficient to equitably divide property, particularly when the assets are diverse, . . . findings on valuation do not require expert testimony and may be accomplished by adopting the values cited in the parties'

8.05 financial disclosures, in the testimony, or in other evidence." *Jenkins v. Jenkins*, 67 So. 3d 5, 13 (¶19) (Miss. Ct. App. 2011). "[I]t is not the chancellor's duty to obtain appraisals of the marital property." *Id.* At the same time, however, "[i]t is the chancellor's responsibility in a divorce proceeding to make an adequate investigation into the value of the marital property that is subject to division[.]" *Id.*

¶36. The chancellor considered the three valuation approaches. She found the asset-based approach inapplicable, as NLS had few assets. NLS is a single-member LLC. It owns little equipment and has no employees or training facility. Rather, Paul travels to various facilities to conduct group or individual training programs. NLS's only assets are the vehicle that Paul drives and a limited amount of training equipment that can be transported in the vehicle. The market-based approached was also ruled out, as no comparable business sales were introduced. Further, the chancellor found this approach inappropriate, as NLS's success is largely due to Paul's reputation and his marketing of the company; thus, an accurate comparison would be difficult.

¶37. While the chancellor found the best approach to be the income-based approach, the chancellor found the parties failed to present sufficient evidence to apply this approach. The chancellor recognized that "[t]o properly value the company under an income-based approach, the [c]ourt would need a valuation expert to review the historic earnings, and after adjusting the income to reflect normalized earnings, multiply the normalized earnings by a capitalization factor." No such valuation expert was presented by the parties. Angela Miller, the CPA who prepares NLS's tax documents, testified as to NLS's net profit for 2010-2013.

But she was not qualified as an expert in valuation. The chancellor thus stated that because of the lack of evidence provided, she simply "considered the income and assets of the company balanced with the debts and liabilities of the company."

¶38. To determine NLS's value, the chancellor looked solely at the profit/loss statement from the previous year, 2013. The statement showed NLS had a net profit in 2013 of $358,383.20. The chancellor used this as a starting figure. Then she added $26,380, the value of a Cadillac Escalade that Paul used to transport equipment for the business. Paul owed $31,261.14 on the Cadillac, so this debt was subtracted. Also, Paul owed $6,084.74 to an accounting firm for tax preparation. This debt was also subtracted, leaving a $347,417.32 balance, which the chancellor used as the business's valuation.

¶39. In addition to one hundred percent of NLS, the chancellor awarded Paul three bank accounts worth a total of $7,251.95, his Cadillac, and the furnishings and personal property in his home worth $34,677.05. Paul was ordered to assume the debt on the Cadillac of $31,261.14, the tax-preparation debt of $6,084.74, the 2013 state taxes of $3,000, and the 2013 federal taxes of $32,592.52. Laura was awarded the marital home worth $390,000, her 2008 Cadillac Escalade worth $13,500, the furnishings and personal property in her home worth $40,000, two bank accounts worth $23,983.17, and the children's college trusts accounts valued at approximately $30,444.43. Laura was ordered responsible for the debt on her Cadillac of $12,323.14, and the $345,562.07 mortgage on the marital home.

¶40. The chancellor noted:

> Due to the disparity in incomes, Laura may need a greater portion of the marital estate to eliminate a need for alimony. However, there are little assets

18

in the marriage that can be awarded to Laura that would balance the value of Paul's business. Even if the Court could equally divide the assets, the division of marital property may not be sufficient to meet Laura's needs.

Because the division of property left Laura with a deficit, the chancellor ordered Paul to pay Laura $73,000 in nonalimony equitable distribution over a ten-year period.

¶41. Paul argues that the chancellor's valuation of NLS was incorrect. Paul argues that instead of using NLS's income from the previous year as the basis of the valuation, the chancellor should have considered what cash "will be" available to Paul if he were to sell the business. Paul also argues the chancellor's valuation erroneously included goodwill. As evidence of this, he cites the chancellor's statement in the business-valuation section of her opinion, which states: "NLS [is] a company built by Paul and reliant upon Paul's reputation, work ethic and positive results for his clients." Paul asserts that this statement "makes it clear" that the chancellor "used the goodwill generated by Paul as a consideration in its value."

¶42. Despite Paul's arguments on appeal regarding how the chancellor should have valued NLS, we note that Paul failed to suggest a valuation or present any testimony or other evidence on valuation. We find the chancellor did the best she could with the evidence presented. Nonetheless, as we cannot find support for the chancellor's valuation, we must reverse for further proceedings.

¶43. In *Mace v. Mace*, 818 So. 2d 1130, 1133 (¶13) (Miss. 2002), the chancellor valued the husband's medical practice at $144,000 based on the husband's testimony alone. However, his valuation did not appear to be based on any reliable method, and it was unclear what, if

19

any, physical assets were included in the valuation. *Id.* at 1134 (¶15). Rather, the husband stated he arrived at the valuation based on a formula he saw in a medical journal, which multiplied net income times six; he admitted he could not give an accurate opinion as to the true value of his practice. *Id.* at (¶14). The supreme court remanded the matter to the chancellor for further proof of business valuation. *Id.* at (¶15). It emphasized the importance of a correct business valuation, stating:

> Property division should be based upon a determination of fair market value of the assets, and these valuations should be the initial step before determining division. Therefore, expert testimony may be essential to establish valuation sufficient to equitably divide property, particularly when the assets are as diverse as those at issue in the instant case.

*Id.* (quoting *Ferguson*, 639 So. 2d at 929). The supreme court held that "[o]n remand the parties themselves may establish valuation of [the husband]'s practice, if reliable, or they may prove valuation utilizing expert testimony." *Id.* The supreme court further held that the chancellor "may appoint an independent expert if absolutely necessary and if the parties are unable to show good cause as to why such expert should not be appointed." *Id.* (citing M.R.E. 706).

¶44. Here, the chancellor recognized the importance of an accurate business valuation, stating, "the foundational step to make an equitable distribution of marital assets is to determine the value of those assets based on competent proof." (Quoting *Dunaway v. Dunaway*, 749 So. 2d 1112, 1118 (¶14) (Miss. Ct. App. 1999)). The chancellor also stated that valuing NLS was complex. However, the chancellor did not require expert testimony or further evidence, stating that "it is the parties' obligation, and not the chancellor['s], to

present evidence touching upon the matters to be tried." *See Dunaway*, 749 So. 2d at 1118

(¶14) ("[I]t is incumbent upon the parties, and not the chancellor, to prepare evidence touching on matters pertinent to the issues to be tried.").

¶45. While the chancellor is correct that the parties are responsible for presenting evidence of valuation, and the chancellor did the best she could with the information available, we find that the business valuation here was such an important aspect of the chancellor's ruling that further testimony was essential to establish a proper valuation to divide the marital property fairly and correctly. We can find no support for the chancellor's valuation of NLS based on one year's financial statement. As previously noted, Paul's business income fluctuates drastically from year to year. While the chancellor's method of valuation may be proper in some instances, we cannot find this approach was appropriate under the circumstances of this case. This is especially true given that the business income may be intertwined with goodwill, as the business hinges on Paul's reputation and personal efforts. We cannot confidently say that the chancellor's approach gave a correct business valuation or excluded goodwill.

¶46. Therefore, we find it necessary to remand this matter to the chancellor for an adequate valuation of NLS. The parties themselves may establish valuation, if they are able to prove a reliable method for doing so, or they may prove valuation through expert testimony. *See Mace*, 818 So. 2d at 1134 (¶15). If they fail to do so, the chancellor may appoint an independent expert in accordance with *Mace*. Such valuation must exclude goodwill. *See id.* Once NLS's correct value is determined, the chancellor must reevaluate the division of

marital property and the amount of nonalimony, if any, that should be awarded.

¶47.   The chancellor's business valuation of NLS and equitable distribution of marital property are reversed and remanded for further proceedings.

### B.   Alimony

¶48.   Alimony should be considered if one party is left with a deficit after equitable division.  *Ferguson*, 639 So. 2d at 926.  "Alimony and equitable distribution are distinct concepts, but together they command the entire field of financial settlement of divorce. Therefore, where one expands, the other must recede."  *Watson v. Watson*, 882 So. 2d 95, 98 (¶15) (Miss. 2004) (quoting *Ferguson*, 639 So. 2d at 929).  "In the final analysis, all awards should be considered together to determine that they are equitable and fair."  *Id.*

¶49.   Paul argues the chancellor's erroneous business valuation of NLS led to an incorrect alimony award.  He also argues that because the chancellor used the 2013 profit/loss figure to calculate NLS's value, and she used the same figure as his income in setting alimony and child support, he was "hit twice."  He argues this is kin to the inequity the supreme court warned against in *Watson*, 882 So. 2d at 101 (¶26).  In *Watson*, Mike Watson was the sole owner of a veterinary clinic.  *Id.* at (¶29).  His wife was awarded permanent alimony based on the clinic's projected future income.  *Id.*  The clinic's projected income was also used to value the business and divide the marital property.  *Id.*  Goodwill was not excluded in the valuation.  *Id.* at (¶26).  The supreme court held:  "Unless the valuation of the professional practice carefully avoids any element attributable to the presence and work of the professional, the result will be a double award to the spouse.  The professional's income will

be used, first to calculate alimony, and then again to calculate the value of the 'business.'"

*Id.*

¶50.    As we are remanding for the chancellor to reconsider the business valuation and equitable distribution of property, we need not address whether the chancellor included goodwill in valuing NLS.  Further, the alimony award in *Watson* is distinguishable from the case at hand.  The wife in *Watson* was awarded permanent alimony, whereas, here, Laura was awarded rehabilitative alimony.  Because rehabilitative alimony serves a unique purpose, it is not tied to equitable division and need not be revisited by the chancellor on remand.  *See Hearn v. Hearn*, 2014-CA-00975-COA, 2016 WL 2638159, at *3 (Miss. Ct. App. May 10, 2016).

¶51.    "Ordinarily, the reversal of a chancellor's division of marital property requires reversal of an alimony award."  *Id.* (citing *Mace*, 818 So. 2d at 1134 (¶16)).  "However, the decision to award rehabilitative alimony 'is not considered during equitable distribution.'"  *Id.* (quoting *Lauro v. Lauro*, 847 So. 2d 843, 849 (¶15) (Miss. 2003)).  "Rehabilitative alimony provides for a party who is trying to become self-supporting and prevents that party from becoming destitute while searching for a means of income. . . . [T]he primary purpose of rehabilitative alimony is to give the former spouse the opportunity to enter the work force."  *Id.* (quoting *McCarrell v. McCarrell*, 19 So. 3d 168, 170 (¶8) (Miss. Ct. App. 2009)).

¶52.    The chancellor considered the factors set out in *Armstrong v. Armstrong*, 618 So. 2d 1278, 1280 (Miss. 1993), in awarding Laura $1,000 monthly rehabilitative alimony for twenty-four months.  The chancellor considered the parties' income and expenses, as is

required under *Armstrong*. The chancellor determined that while Laura was capable of earning a good salary as a physical therapist, she needed support while reentering the workplace. The chancellor also considered Paul's greater earning potential and Laura's responsibility for the mortgage on the marital home and the debt on her vehicle. The chancellor found that Laura would likely become insolvent without support.

¶53. The chancellor's decision to award rehabilitative alimony was supported by substantial evidence and was not clearly erroneous. Paul's argument that the chancellor's erroneous valuation of NLS requires reversal of the rehabilitative-alimony award is without merit. However, as we are remanding for reevaluation of NLS's fair market value and equitable distribution of the marital property, we note that the chancellor may find an award of periodic or lump-sum alimony to be proper upon reevaluation. These types of alimony are tied to equitable distribution, and "all awards should be considered together to determine that they are equitable and fair." *Watson*, 882 So. 2d at 98 (¶15). Nothing in this opinion prohibits the chancellor from revisiting periodic or lump-sum alimony on remand.

### IV.    Newly Discovered Evidence

¶54. After the chancellor's judgment was entered, Paul moved for a new trial. He sought to present "newly discovered evidence" that Laura had moved from Madison to the Gulf Coast; Laura had cashed out a retirement account, leaving him with an additional $13,690.48 tax burden; the accounting bill for the 2013 taxes had increased; and his income had decreased. At the hearing on the new-trial motion, the chancellor excluded Paul's alleged newly discovered evidence, stating his arguments were better suited for a modification

24

action. Paul argues it was error for the chancellor not to consider the evidence, as it went to Laura's credibility and was relevant for reconsideration of child custody and the equitable division of assets.

¶55. A motion for a new trial under Mississippi Rule of Civil Procedure 59 based on newly discovered evidence "is an extraordinary motion, and the requirements of the rule must be strictly met." *McNeese v. McNeese*, 119 So. 3d 264, 272 (¶20) (Miss. 2013). Newly discovered evidence is evidence that existed at the time of trial, but was discovered after trial; it does not include "evidence that did not exist at the time of trial." *In re V.M.S.*, 938 So. 2d 829, 834 (¶10) (Miss. 2006) (citing *Gray v. Gray*, 562 So. 2d 79, 82 (Miss. 1990) (stating that authorities interpreting Federal Rule of Civil Procedure 60(b)(3) "seem unanimous in holding that" newly discovered evidence "must have been in existence at the time of trial or at the time of the judgment which is allegedly in need of correcting")).

¶56. None of Paul's claims are newly discovered evidence. Laura's alleged move occurred posttrial. Thus, Laura's alleged move cannot qualify as newly discovered evidence. The additional tax burden resulting from Laura cashing out a retirement account is likewise not newly discovered evidence. Paul testified at trial that he was aware that Laura cashed out the account in 2013. He testified that he did not know if Laura had withheld taxes when she cashed out the account, but that he realized if she did not, it would "greatly" impact the parties' tax liability if they filed jointly. Laura admitted at trial to withdrawing the money from her retirement account, and she testified there would be penalties and additional taxes as a result of her doing so. Paul had a CPA whom he typically contacted on a monthly basis

25

who could have investigated the tax consequences of the retirement account's liquidation. The fact that he failed to request the CPA to do so until after trial does not make this evidence newly discovered. Finally, Paul's argument that his income had decreased in the first three months of 2014 is not newly discovered evidence, as this did not occur until after trial.

¶57. As to Paul's arguments regarding Laura's alleged move, the chancellor recognized his concern regarding this in her opinion, stating, "Paul was concerned about Laura moving from the Madison area to be near her family and friends in the Atlanta or Ocean Springs area." So the chancellor was aware Laura's moving was a possibility and was able to consider it when rendering her opinion. Regardless, none of Paul's assertions are newly discovered evidence, and the chancellor correctly excluded them from consideration posttrial. This issue is without merit.

### V. Cumulative Error

¶58. The cumulative-error doctrine states that multiple errors, which alone may not require reversal, may constitute reversible error if the cumulative effect of the errors resulted in an unfair trial. *Blake v. Clein*, 903 So. 2d 710, 732 (¶68) (Miss. 2005). As we find reversal is warranted on the issues of business valuation and equitable distribution, we need not address Paul's cumulative-error argument.

### VI. Laura's Request for Attorney's Fees on Appeal

¶59. In the conclusion of her brief, Laura seeks an award of attorney's fees on appeal. "Generally, this Court has awarded attorneys' fees on appeal 'in the amount of one-half of

what was awarded in the lower court.'" *Holloway v. Holloway*, 31 So. 3d 57, 64 (¶24) (Miss. Ct. App. 2009) (quoting *Lauro*, 924 So. 2d at 592 (¶33)). Remanding on certain issues, such as visitation or "calculation of child support does not, in and of itself, preclude the possibility that we award attorneys' fees on appeal." *Id.*; *see also Santos v. Santos*, 225 Miss. 425, 429, 83 So. 2d 636, 637 (1955) (finding wife entitled to one-half attorney's fees on appeal, despite reversal of divorce decree in favor of husband).

¶60.    Laura was awarded $5,000 in attorney's fees in the chancellor's final judgment. She has submitted an itemized bill for $8,355.93 for her attorney's fees on appeal. We find Laura is entitled to $2,500 in attorney's fees on appeal.

## CONCLUSION

¶61.    As we find a lack of support in the record for the chancellor's business valuation of NLS, we reverse and remand for an adequate valuation either through additional testimony of the parties or an expert, who may be appointed by the chancellor if necessary. Once an accurate business valuation is obtained, the chancellor shall revisit the equitable division of property and nonalimony award. The chancellor may also revisit whether an award of periodic or lump-sum alimony may be necessary. All other issues are affirmed.

¶62.    **THE JUDGMENT OF THE MADISON COUNTY CHANCERY COURT IS AFFIRMED IN PART AND REVERSED AND REMANDED IN PART FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE DIVIDED EQUALLY BETWEEN THE APPELLANT AND THE APPELLEE.**

**LEE, C.J., IRVING, P.J., ISHEE, FAIR, WILSON AND GREENLEE, JJ., CONCUR. GRIFFIS, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. JAMES, J., CONCURS IN PART WITHOUT SEPARATE WRITTEN OPINION. CARLTON, J., CONCURS IN PART AND**

27

**DISSENTS IN PART WITH SEPARATE WRITTEN OPINION.**

**CARLTON, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶63.    I would affirm the chancellor's judgment in this case.  In applying our controlling standard of review, I submit that the record supports the income-based-approach valuation utilized by the chancellor in determining the market value of Paul's company, NLS.  The record also supports the chancellor's finding that the parties failed in their obligation to present evidence below to support use of the income-based approach.

¶64.    In utilizing the income-based approach, the chancellor explained that she "would need a valuation expert to review the historic earnings, and after adjusting the income to reflect normalized earnings, multiply the normalized earnings by a capitalization factor."  The record reflects that neither Paul nor Laura presented a valuation expert.  As a result of the lack of evidence provided by the parties to support the income-based approach, the record shows that the chancellor "considered the income and assets of [NLS] balanced with the debts and liabilities of the company."  The evidence in the record supports the chancellor's valuation using this asset approach.

¶65.    We will not disturb the findings of a chancellor unless she was manifestly wrong or clearly erroneous, or applied an erroneous legal standard.  *Tatum v. Tatum*, 54 So. 3d 855, 859 (¶9) (Miss. Ct. App. 2010).  We will affirm a chancellor's decision where it is supported by substantial credible evidence.  *Id.*  "[W]hen reviewing a chancellor's equitable distribution of property, this Court . . . reviews the judgment to ensure that the chancellor followed the appropriate standards and did not abuse [her] discretion."  *Layton v. Layton*, 181 So. 3d 275,

279 (¶10) (Miss. Ct. App. 2015) (citing *Phillips v. Phillips*, 904 So. 2d 999, 1001 (¶8) (Miss. 2004)).

¶66.    Paul cannot complain on appeal that the chancellor abused her discretion by utilizing the income-based asset/liability approach herein since Paul failed to present sufficient evidence to allow the chancellor to utilize the income-based approach.  We have previously held that "this Court refuses to blame the chancellor for a party's failure to present sufficient evidence of property valuation." *Jenkins v. Jenkins*, 67 So. 3d 5, 13 (¶20) (Miss. Ct. App. 2011).  As a result, I respectfully concur in part and dissent in part from the majority's opinion.  In so doing, I would affirm the judgment of the chancery court.