# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-CA-00955-COA

**MARK JEROME CHISM**                                        **APPELLANT**

**v.**

**LANDARIA LAROSE (SAULSBERRY) CHISM**                       **APPELLEE**

DATE OF JUDGMENT:          03/19/2018
TRIAL JUDGE:               HON. PERCY L. LYNCHARD JR.
COURT FROM WHICH APPEALED: DESOTO COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:    JERRY WESLEY HISAW
ATTORNEYS FOR APPELLEE:    A.E. (RUSTY) HARLOW JR.
                           KATHI CRESTMAN WILSON
NATURE OF THE CASE:        CIVIL - DOMESTIC RELATIONS
DISPOSITION:               AFFIRMED IN PART; REVERSED AND
                           REMANDED IN PART - 06/04/2019
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE BARNES, C.J., TINDELL AND McCARTY, JJ.**

**BARNES, C.J., FOR THE COURT:**

¶1.     This appeal originates from a divorce action filed by Mark Chism.  Ultimately, the parties agreed upon an irreconcilable-differences divorce, with the chancery court deciding property division and alimony.  Mark now appeals the DeSoto County Chancery Court's judgment regarding the contested matters.

¶2.     Mark claims the chancery court improperly conducted the trial even though he requested a continuance because his attorney was allowed to withdraw two days beforehand, and he therefore had to represent himself at trial.  Additionally, he disagrees with the valuation of his business for property division, as the only proof presented for its value was

Landaria's estimate. Mark further complains that the chancery court erred in finding him in contempt and ordering him incarcerated for lack of payment of support to Landaria and lack of compliance with discovery requests. He also claims error with the chancery court's award to Landaria of lump-sum alimony and related failure to consider his temporary support payments to her—and her award of attorney's fees.

¶3. We find no error and affirm the issues related to Mark's lack of counsel at trial, his contempt, and Landaria's award of attorney's fees. As to the valuation of the business, we find there was insufficient proof and it is necessary to reverse and remand to the chancery court for further proceedings on this issue, as well as Landaria's award of alimony, which should be reconsidered in light of the business valuation.

## FACTS

¶4. In July 2010 the parties were married. No children were born of the marriage. The parties opened a profitable chicken-wing and fried-catfish business, Memphis Best Wings, at 5144 Riverdale Road in Memphis, Tennessee during the marriage. Landaria quit her job teaching to work at the restaurant when it opened. She received a salary of $700 per week, working daily from 9:00 a.m. until closing.

¶5. After five years of marriage, the parties finally separated in June 2015. Mark filed for divorce and division of the marital property in August 2015. Landaria answered and counterclaimed for divorce, property division, and attorney's fees. She also petitioned the court for temporary spousal support. In October 2015, a temporary order was entered, requiring Mark to pay Landaria $500 a month in temporary alimony and $500 a month

2

toward a vehicle upon proof of the amount she was paying toward a vehicle.

¶6. Discovery ensued, and both parties obtained new counsel.[1] Numerous discovery disputes occurred, with both parties being granted motions to compel. In August and September 2017, Mark had motions for contempt granted against him for failure to pay Landaria's temporary support and failure to comply with motions to compel discovery, which resulted in his being incarcerated. Numerous continuances occurred due in part to Mark's failure to keep an attorney and his failure to cooperate with the discovery process, which were undoubtedly related.

¶7. The chancellor allowed Mark's third attorney to withdraw on one day's notice, two days before trial on March 16, 2018, under the condition that the trial would not be continued. Even so, Mark moved for a continuance, which the chancery court denied. Before trial, the parties had agreed to an irreconcilable-differences divorce, and trial proceeded on property division and alimony, with Mark representing himself. It was Mark's contention that the couple had no joint assets, debt, or real property; not surprisingly, Landaria disagreed. Testimony ensued about these matters. Five years before the parties married, Mark purchased a home as an "unfinished foreclosure." It was valued at $650,000, with Mark owing approximately $435,000 at the time of trial. Landaria also owned a home that she had inherited. She took out a mortgage against that property in excess of $30,000 to use for a second Best Wing business location that subsequently closed after the parties separated. Mark testified to owning approximately nine vehicles and two motorcycles,

---

[1] Landaria changed attorneys once. Her first attorney was allowed to withdraw approximately one year into the case in September 2016.

including a 2016 Corvette, a 2015 Mercedes S Class, a 2006 Harley Davidson Road Glide, a 2013 Honda Gold Wing motorcycle, a 2015 Chevrolet Colorado, and a restored 1959 Corvette. The parties disputed the values of many of the vehicles, especially the 1959 Corvette, which Mark claimed was worth $15,000, while according to Landaria's research the value was $60,000. Also, the marital home contained a $9,000 piano, as well as furnishings valued at $35,000 to $40,000.

¶8. Mark confirmed the amount reported on his Uniform Chancery Court Rule 8.05 financial declaration form for net monthly income was $5,400, with monthly expenses totaling $4,873, including his residential mortgage of $2,300 and two car payments of $960 each for the Mercedes and 2016 Corvette. Mark maintained only one bank account for both personal and business matters. As an example of his business income, Mark confirmed that in July 2017 his deposits were $22,447.72; however, some customers paid cash. Mark claimed he did not retain cash from the business for personal use. After payment of all business and personal bills, funds still remained in the couple's bank account. For August 2017, $31,046 was deposited. Mark testified that he was considering expanding his business in the future.

¶9. Partway through the hearing, the chancellor warned Mark that he perceived Mark's testimony on his personal and business finances "ludicrous" and untruthful based upon Mark's responses and documentation introduced to impeach his testimony. The hearing resumed with Landaria's testimony. At the time of trial, she was employed at a Catholic school where her income was $628 biweekly. She owned a 2006 Toyota Matrix purchased

4

after separation, with a car payment of $423.33 per month. Mark currently owed her $20,000 for the vehicle allowance ordered by the court in October 2015. Landaria claimed she had no money to pay her attorney's fees. Regarding Mark's retention of cash from the business for personal use, Landaria testified that after taking the cash home from the restaurant to count it, Mark did not deposit the hundred-dollar bills; instead, she said he hid them from her in the house and then used this cash to purchase all of his vehicles. The chancellor, however, found Landaria's explanation "ludicrous," commenting that the more truthful scenario was probably that the couple was living off of the cash made at the restaurant. Landaria agreed with this assessment.

¶10. The chancellor began his financial fact findings from the bench by reiterating strongly that even after his warning to Mark, he still did not find his testimony truthful:

> I believe that through your testimony, having heard it live and in person and seen your demeanor, that you have attempted throughout this proceeding to tinkle on my leg and try to convince me that it's raining, and I don't buy it. There is no way you can maintain the lifestyle that you maintain in collecting and restoring vintage automobiles, driving one and two-year old Corvettes and Mercedes, living in a $650,000 house with only $5,400 per month in income. That just doesn't compute.

However, the chancellor found the chicken-wing business was worth $1,000,000, based solely upon Landaria's estimate and the figure provided on her Rule 8.05 financial form. Mark did not include this asset on his Rule 8.05 form, and did not offer any testimony to rebut her estimate. Mark was found in contempt for nonpayment of the vehicle allowance as required by the temporary order, resulting in his second incarceration. Additionally, Mark was ordered to pay $96,000 in lump-sum alimony at the rate of $2,000 a month, as well as

5

$2,500 per month toward Landaria's property division award of $521,999, which included one-half the value of the business and twenty-five percent of the equity in the marital home or $30,000, as well as attorney's fees totaling $27,572.58. She also received several of the vehicles in the property distribution, including the restored 1959 Corvette with a value of $59,000.

¶11. Mark retained new counsel post-trial. Both parties filed post-trial motions to reconsider under Mississippi Rule of Civil Procedure 59. Among other matters, Mark argued the chancery court erred in not appointing a business valuation expert because there was inadequate proof of the business's value offered by the parties. Landaria requested the chancery court clarify payment of attorney's fees and alter the equitable distribution of marital property because of misrepresentations Mark made to the court about possession of two vehicles. Mark's motion was denied, and Landaria's was granted in part, awarding her additional post-trial attorney's fees. Mark timely appealed raising several issues; each will be discussed in turn.

## STANDARD OF REVIEW

¶12. The appellate court "will not disturb a chancellor's judgment when supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied." *Chapel v. Chapel*, 876 So. 2d 290, 292 (¶8) (Miss. 2004). The standard of review is deferential because "a chancellor, being the only one to hear the testimony of witnesses and observe their demeanor, is in the best position to judge their credibility." *In re Estate of Carter*, 912 So. 2d 138, 143 (¶18)

6

(Miss. 2005). The reviewing court "will not hesitate to reverse if it finds the chancellor's decision is manifestly wrong, or that the court applied an erroneous legal standard." *Owen v. Owen*, 928 So. 2d 156, 160 (¶11) (Miss. 2006). The chancellor's conclusions of law are reviewed de novo. *Chesney v. Chesney*, 910 So. 2d 1057, 1060 (¶5) (Miss. 2005).

## ANALYSIS

### 1. Mark's Lack of Trial Counsel

¶13. Mark alleges his constitutional rights were violated because he did not have an attorney at trial. He claims prejudice—because he lacked counsel, he could not adequately explain his income and current financial situation to the chancellor.

¶14. The trial court's decision to grant or deny a motion for a new trial is reviewed for an abuse of discretion, as is a decision to deny a motion for continuance. *Rogers v. Morin*, 791 So. 2d 815, 820 (¶11) (Miss. 2001); *Robinson v. Brown*, 58 So. 3d 38, 42 (¶10) (Miss. Ct. App. 2011). Additionally, the reviewing court "will not reverse the denial of a continuance absent a finding of prejudice." *Robinson*, 58 So. 3d at 42 (¶10). Further, "there is no right to counsel in a civil proceeding." *Chasez v. Chasez*, 957 So. 2d 1031, 1038 (¶21) (Miss. Ct. App. 2007).

¶15. The record indicates that this case had been pending before the chancery court for two years. Mark's refusal to cooperate with the litigation process resulted in several orders of contempt against him, and undoubtedly contributed to his inability to keep an attorney. Through the course of the litigation, Mark had three attorneys before he ultimately represented himself at trial. Approximately six months after he filed Mark's complaint, his

7

first attorney was granted withdrawal in January 2016, stating that "irreconcilable differences have arisen between attorney and client which make continued representation impossible." In May 2017, the chancellor allowed Mark's second attorney to withdraw, and in July 2017, his third attorney filed a notice of appearance.

¶16.    At a hearing in September 2017, Mark's third attorney appeared. The chancellor heard Landaria's motions to compel and for contempt on Mark's failure to respond to discovery and failure to pay her vehicle allowance for over two years. After hearing Mark's latest counsel of two months explain how she was trying to become familiar with Mark's case and assist him with compliance on the various orders, the chancellor made several remarks about Mark's inability to work with his attorneys. The chancellor stated Mark was causing his latest counsel "untold headaches because of [his] refusal to cooperate in discovery . . . [when counsel was] doing her dead level best to represent [him] to the best of her ability." The chancellor said Mark was "sending her into a boxing ring with both hands tied behind her back" and that he was "personally tired of [his] excuses" regarding lack of compliance with discovery and court orders. Mark was subsequently incarcerated for contempt.

¶17.    This same attorney moved to withdraw on Wednesday, March 14, 2018, two days before trial, due to an "irreparable conflict of interest" with Mark. The chancellor notified the parties that he would allow Mark's attorney to withdraw, but the trial would not be continued again. Even so, at the beginning of trial on Friday, March 16, Mark requested a continuance because of his attorney's release and because he did not know the trial was set

8

until two days beforehand. The chancellor informed Mark that the matter had been set since February 7, 2018, and the parties were aware of this date. Accordingly, proceedings commenced, with Mark appearing pro se.

¶18. We cannot say the chancellor erred in denying a continuance of the trial because Mark lacked counsel. It is apparent that the reason Mark did not have counsel is because he could not cooperate with any of his three attorneys. The transcript of the hearing in September 2017 shows his counsel was trying her best to assist Mark on the contempt issues, to no avail. Because of Mark's own actions, he was unrepresented at trial. He cannot now argue error for a situation he created.

¶19. Further, Mark was not prejudiced by appearing pro se. The trial proceeded in a fair manner, with the chancellor giving Mark sufficient flexibility to present his case as a pro-se litigant. Mark should have been more familiar with his finances than anyone else, and, therefore, able to present evidence of his finances to the court. Accordingly, we find this issue without merit.

### 2. Valuation of Mark's Business

¶20. Mark argues that the chancellor erred in accepting Landaria's valuation of the couple's business without sufficient proof and therefore led to an inequitable division of the marital property. Thus, Mark claims the entire financial award must be reversed and remanded.

¶21. To resolve property division, the chancellor must: "(1) classify the parties' assets as marital or separate, (2) value those assets, and (3) divide the marital assets equitably."

*Burnham v. Burnham*, 185 So. 3d 358, 361 (¶12) (Miss. 2015). Equitable division of property is governed by the factors articulated in *Ferguson v. Ferguson*, 639 So. 2d 921, 929 (Miss. 1994). The third *Ferguson* factor asks the chancellor to consider "[t]he market value . . . of the assets subject to distribution." *Ferguson*, 639 So. 3d at 929. Three methods of valuation may be used to determine the market value of a business for this purpose: "(1) an asset-based approach, in which assets and liabilities are evaluated, (2) a market-based approach, in which the market is surveyed for similar sales, or (3) an income-based approach, in which a value is placed on earning potential." *Lacoste v. Lacoste*, 197 So. 3d 897, 907 (¶34) (Miss. Ct. App. 2016) (citing *Singley v. Singley*, 846 So. 2d 1004, 1011 (¶18) (Miss. 2002)).

> Regardless of what method an expert might choose to arrive at the value of a business, the bottom line is one must arrive at the "fair market value" or that price at which property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of the relevant facts.

*Id.*

¶22. The chancellor found the total value of all marital property, including the business, was $1,176,598. Landaria was awarded fifty-percent of that value. Taking into account the *Ferguson* factors and distribution of other marital property, Landaria was ultimately awarded $521,299. Mark does not dispute that the chicken-wing business was a marital asset. However, he maintains that because the business was the couple's main asset and source of income, a more specific business evaluation was necessary for an equitable distribution of marital property.

10

¶23.    The chancellor found that the parties owned Memphis Best Wings. Although Mark had operated another chicken-wing business prior to the marriage, he started this new business jointly with Landaria during the marriage, and both parties contributed. In fact, Landaria quit her job as a teacher to work at the restaurant as a paid employee. However, not surprisingly, she was dismissed upon the parties' separation. These facts are uncontested. The chancellor found the business's value was $1,000,000 according to Landaria's unsupported testimony and Rule 8.05 estimate. No details of how she arrived at this valuation were provided, and Mark did not even list the business on his Rule 8.05 form. The chancellor found that the business had "grown into a very substantial and profitable" one. He stated the $1,000,000 figure "has not been disputed" by Mark, who did not rebut this estimate at trial or offer his own estimate. Yet, there was no testimony from Landaria about how she arrived at that value for the business. Landaria even admitted, when asked by the chancellor, that her stated value was "just [her] estimate." However, Mark's 2014–2016 tax returns, provided during discovery, were admitted into evidence and included his profit and loss income statements. These evidence net profits of $60,291; $48,543; and $63,516, respectively, which does not appear to support a $1,000,000 valuation.[2] During his examination of Mark, Landaria's counsel tried to show that Mark was "keep[ing] the cash out of the business [account]." A photograph was entered into evidence showing Mark and his sister sitting at a table with a pile of cash on it, but none of these bills appear to be large ones. Statements showed that Mark made few cash deposits

_____

[2] Also, on his Rule 8.05 form, Mark only reported $5,400 in net income per month from his business.

11

to the bank each month, but he maintained that he bought supplies and paid bills with the cash and did not keep it for personal use. Additionally, the chancellor speculated that the couple was not reporting all of their cash earnings from the business but using this money to fund their extravagant lifestyle.

¶24. In Mark's post-trial motion to reconsider, he argued the chancellor erred by appointing a business-valuation expert, and Mark moved to designate Robert Vance as such an expert. Vance submitted a valuation report which came to the conclusion that Memphis Best Wings had a fair market value of $1,898 as a going-concern entity, excluding goodwill. Vance used the asset-based approach for his valuation, claiming that the market-based approach and the income-based approach are inappropriate because they imply the existence of goodwill in the value of a business, which is prohibited under Mississippi law, citing *Lacoste* and *Singley v. Singley*, 846 So. 2d 1004, 1011 (¶18) (Miss. 2002). Landaria moved to strike the expert's testimony and opinion because discovery had been completed for well over a year. Mark moved to proffer it, and a hearing was held on the matter. Although the chancellor denied Mark's motion to reconsider, he allowed the expert's proffered testimony and business valuation report, dated April 3, 2018, for identification purposes.

¶25. This Court and the Mississippi Supreme Court have reversed the chancellor when evidence on the valuation of the business in property distribution was insufficient. In *Lacoste*, this Court reversed and remanded a business valuation which the chancellor based on the previous year's profit/loss statement. *Lacoste*, 197 So. 3d at 908 (¶38). Like here, the business was considered the couple's main asset and source of income. *Id.* at 907 (¶34).

However, the parties failed to present sufficient evidence to value the business by the approach the chancellor deemed best (the income-based approach). *Id.* at 908 (¶37). While we found "the chancellor did the best she could with the evidence presented," this Court nonetheless found it necessary to reverse because of lack of support for the valuation. *Id.* at 909 (¶42). In *Mace v. Mace*, 818 So. 2d 1130, 1133 (¶¶13, 16) (Miss. 2002), the Mississippi Supreme Court reversed the chancellor on the value placed upon a husband's medical practice which was a marital asset. The value of $144,000 was determined solely by the husband's testimony, did not appear to be based upon any reliable method, and it was unclear what physical assets were included in the valuation. *Id.* at 1134 (¶15).

¶26. Moreover, this Court, following the Mississippi Supreme Court's directions, has stated that "the foundational step to make an equitable distribution of marital assets is to determine the value of those assets based on competent proof." *Dunaway v. Dunaway*, 749 So. 2d 1112, 1118 (¶14) (Miss. Ct. App. 1999) (citing *Ferguson*, 639 So. 2d at 929). As stated earlier, the chancellor must determine the "fair market value" of the business, using one of the three approaches: an asset-based approach, a market-based approach, or an income-based approach. *Lacoste*, 197 So. 3d at 908 (¶34) (quoting *Singley*, 846 So. 2d at 1011 (¶18)).

¶27. Not all approaches will be applicable for all businesses. For example, in *Lacoste*, the chancellor found an asset-based approach was inapplicable because the business had few assets, owned little equipment, and had no employees or training facility. *Lacoste*, 197 So. 3d at 908 (¶36). The market-based approach was also ruled out as no comparable business

13

sales were introduced, and the business's success was largely due to the reputation of the owner and marketing. *Id.* The chancellor, therefore, considered only the income-based approach as appropriate. *Id.* at (¶37). We found, however, that given the drastic income fluctuations and possibility that income "may be intertwined with goodwill, as the business hinge[d] on [the husband's] reputation and personal efforts," the case had to be remanded for further evaluation. *Id.* at 910 (¶45).

¶28.     Here, the chancellor was unable to adopt any of the three approaches as none were presented to him. Landaria offered only an unsupported estimate on her 8.05 form and testimony. Mark did not provide any value for the business on his Rule 8.05 form or give any testimony as to its value. As established in *Lacoste* and *Mace*, the chancellor should require that the parties utilize a reliable method of valuation and support it with adequate proof, or prove valuation through expert testimony. *See Lacoste*, 197 So. 3d at 910 (¶46); *Mace*, 818 So. 2d at 1134 (¶15). If they fail to offer such proof, the chancellor may appoint an independent valuation expert. *Id.* Accordingly, we reverse the chancellor's $1,000,000 valuation of Memphis Best Wings and remand for further proceedings.

### 3.     Lump-Sum Alimony

¶29.     After considering the *Armstrong*[3] factors, the chancellor awarded Landaria a lump-sum alimony award of $96,000 payable over forty-eight months. Mark argues Landaria's alimony award must be reconsidered due to the reexamination of the business valuation and property division. We agree.

---

[3] *Armstrong v. Armstrong*, 618 So. 2d 1278 (Miss. 1993).

¶30.    "Alimony and equitable distribution are distinct concepts, but together they command the entire field of financial settlement of divorce.  Therefore, where one expands, the other must recede." *Watson v. Watson*, 882 So. 2d 95, 98 (¶15) (Miss. 2004) (quoting *Ferguson*, 639 So. 2d at 929).  "In the final analysis, all awards should be considered together to determine [if] they are equitable and fair." *Id.*

¶31.    Mark also argues it was manifest error for the chancellor to fail to make an on-the-record analysis of the *Armstrong* factors.  In *Lowrey*, the supreme court required that the *Armstrong* and *Ferguson* factor findings "be considered on the record in every case." *Lowrey v. Lowrey*, 25 So. 3d 274, 280 (¶7) (Miss. 2009).  Although the chancellor did not specifically analyze each *Armstrong* factor in his judgment, he did make detailed on-the-record findings orally at the end of the hearing, which is sufficient.  We find no error.

¶32.    Mark also argues that the chancellor did not fully analyze all of the *Ferguson* factors, specifically with regard to his temporary support payment of $20,000 for a vehicle allowance and $19,000 for a temporary award of alimony.  We disagree.  Mark does not specify under which factor the temporary support award should have been analyzed.  Mark may be referring to the last *Ferguson* "catch-all" factor—"any other factor which in equity should be considered." *Ferguson*, 639 So. 2d at 928. Regardless, we find no error.  In the judgment, the chancellor gave detailed on-the-record findings of all *Ferguson* factors except this last one; however, at the hearing the chancellor addressed it and found nothing to consider.

¶33.    Because this Court is reversing part of the chancellor's division of marital property,

we find it necessary to reverse the award of lump-sum alimony as well so that the chancellor may revisit the alimony award on remand since alimony and equitable distribution are considered together. *Watson*, 882 So. 2d at 98 (¶15).

### 4. Contempt

¶34. Mark claims the chancellor erred in finding him in contempt. The chancellor found Mark was in willful civil contempt of the October 7, 2015 temporary order where Mark had been ordered to pay $500 per month in temporary support to Landaria and no more than $500 a month for a vehicle allowance. At one point during the hearing Mark denied that he had to pay the vehicle allowance because he "gave her the truck." However, later Mark admitted he had not paid any of the vehicle allowance, amounting to $20,000,[4] as of the date of trial, despite numerous contempt orders over two and one-half years.[5] Therefore, the chancellor ordered Mark incarcerated until the $20,000 was paid in full, including the payment of attorney's fees, which will be discussed in the next issue.

¶35. "Contempt matters are committed to the sound discretion of the trial court." *Doyle v. Doyle*, 55 So. 3d 1097, 1110 (¶44) (Miss. Ct. App. 2010). The primary purpose of a

---

[4] Mark argues for the first time on appeal that there is a mathematical error with the $20,000 vehicle allowance and the figure owed should be only $15,000 (thirty months at $500). Mark had numerous opportunities to raise this error with the chancery court and did not. It is well established that a party is not allowed to raise an issue for the first time on appeal. *Ory v. Ory*, 936 So. 2d 405, 409 (¶9) (Miss. Ct. App. 2006). Accordingly, this issue is waived.

[5] The chancellor also found Mark in contempt of the temporary order for failure to pay the amounts ordered in December 2016, August 2017, and September 2017, when Mark was ordered incarcerated. Mark ultimately paid the temporary support but not the vehicle allowance.

16

civil-contempt order is to enforce compliance with a court order. *Stallings v. Allen*, 201 So. 3d 500, 504 (¶14) (Miss. Ct. App. 2016). Contempt issues are questions of fact decided on a case-by-case basis. *Gilliland v. Gilliland*, 984 So. 2d 364, 369 (¶19) (Miss. Ct. App. 2008). "Failure to comply with a court order is prima facie evidence of contempt." *Id.* "To rebut a prima facie case of contempt, a defendant must show an 'inability to pay, that the default was not willful, that the provision [violated] was ambiguous, or that performance was impossible.'" *Id.* An adjudication of civil contempt must be proven by clear and convincing evidence. *Id.* "The contemnor may be jailed or fined for civil contempt; however, [he] must be relieved of the penalty when he performs the required act." *Dennis v. Dennis*, 824 So. 2d 604, 608 (¶8) (Miss. 2002).

¶36. At the hearing in January 2017, Mark's counsel claimed the reason Mark refused to pay the vehicle allowance was because the required proof-of-payment invoices Landaria submitted were inadequate; they were merely bank statements. The temporary order required her to provide "an invoice or bill each month showing the amount she [was] paying toward a vehicle, and [Mark to] immediately forward to her up to $500.00 toward said vehicle." However, at trial on March 2018, after testimony by both parties on the matter, the chancellor found by clear and convincing evidence that Landaria had forwarded the required invoices to Mark for the vehicle allowance, and they were sufficient. We find no error in this regard.

¶37. Mark also complains that the chancellor should not have incarcerated him for contempt. However, a chancellor is given "substantial discretion in deciding contempt

17

matters because of the chancellor's 'temporal and visual proximity' to the litigants." *Gilliland*, 984 So. 2d at 369-70 (¶19) (quoting *Mabus v. Mabus*, 910 So. 2d 486, 491 (¶20) (Miss. 2005)). At trial, the chancellor explained that incarceration was appropriate because it was apparent Mark was "thumb[ing] his nose at the court" because Mark had refused to pay Landaria the vehicle allowance for over two and one-half years in spite of several court admonishments. Mark had even been incarcerated approximately six months earlier for the same reason. The chancellor acted within his discretion by placing Mark under arrest until he purged himself of contempt. A few days later, Mark was released from jail on March 19, 2018, after paying the $20,000 vehicle allowance and attorney's fees. We find no error.

### 5.   Attorney's Fees

¶38.   Finally, Mark argues that the chancellor improperly awarded attorney's fees to Landaria in the amount of $27,582.58, of which $4,137.38 were incurred for contempt matters. Additionally, Mark claims the chancellor erroneously awarded Landaria post-trial attorney's fees. She was awarded $2,911.50 for a temporary restraining order and $3,891.51 for post-divorce legal assistance for liquidation of marital assets she was awarded.

¶39.   "When a party is held in contempt for violating a valid judgment of the court, attorney's fees should be awarded to the party that has been forced to seek the court's enforcement of its own judgment." *Heisinger v. Riley*, 243 So. 3d 248, 259 (¶45) (Miss. Ct. App. 2018). "Fees awarded on this basis, though, should not exceed the expense incurred as a result of the contemptuous conduct." *Id.* (quoting *Roberts v. Roberts*, 110 So. 3d 820, 828 (¶23) (Miss. Ct. App. 2013)). Otherwise, "[c]hancellors have broad discretion to

18

determine attorney fees." *Huseth v. Huseth*, 135 So. 3d 846, 859 (¶41) (Miss. 2014). "We are reluctant to disturb a chancellor's discretionary determination whether or not to award attorney fees and of the amount of any award." *Id.* The Mississippi Supreme Court established several factors to determine the proper amount of attorney's fees to award in domestic cases in *McKee v. McKee*, 418 So. 2d 764, 767 (Miss. 1982). The *McKee* factors state that an award of attorney's fees "should be fair, should compensate only work actually performed, and should be based upon a finding that the work was reasonably required and necessary." Deborah H. Bell, *Bell on Mississippi Family Law* § 12.02 [1], at 359 (1st ed. 2005) (citing *McKee*, 418 So. 2d at 767). This Court permits an award of attorney's fees "in a divorce case where the requesting party establishes an inability to pay." *Stewart v. Stewart*, 2 So. 3d 770, 776 (¶18) (Miss. Ct. App. 2009). "However, if a party is financially able to pay her attorney, an award of attorney's fees is not appropriate." *Id.*

¶40.   The chancellor found Landaria had an inability to pay, and the $27,582.58 in attorney's fees submitted by Landaria's counsel was reasonable and necessary under the *McKee* factors. He found fifteen percent of the attorney's fees incurred, or $4,137.38, were related to contempt matters. Mark disagrees with the chancellor's finding that Landaria cannot pay her attorney's fees. However, we cannot say that the chancellor abused his discretion in this finding. Finally, Mark has cited no authority that prohibits the award of post-trial attorney's fees to assist in the implementation and enforcement of the chancellor's final judgment. Accordingly, this issue is without merit.

**CONCLUSION**

19

¶41. We affirm on the issues related to Mark's lack of counsel at the trial proceeding, the finding of contempt, and Landaria's award of attorney's fees. On the valuation of the business and Landaria's award of alimony, we reverse and remand to the chancery court for further proceedings consistent with this opinion.

¶42. **AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**CARLTON AND J. WILSON, P.JJ., GREENLEE, WESTBROOKS, TINDELL, McDONALD, LAWRENCE, McCARTY AND C. WILSON, JJ., CONCUR.**