# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-CA-00183-COA

**JESSY N. SMITH**                                                          **APPELLANT**

**v.**

**CHRISTOPHER R. SMITH**                                                    **APPELLEE**

DATE OF JUDGMENT:              02/08/2022
TRIAL JUDGE:                  HON. LAWRENCE PRIMEAUX
COURT FROM WHICH APPEALED:    LAUDERDALE COUNTY CHANCERY
                              COURT
ATTORNEY FOR APPELLANT:       MATTHEW ALLEN BALDRIDGE
ATTORNEY FOR APPELLEE:        KATHRYN RAE McNAIR
NATURE OF THE CASE:           CIVIL - DOMESTIC RELATIONS
DISPOSITION:                  AFFIRMED IN PART; REVERSED AND
                              REMANDED IN PART - 02/13/2024
MOTION FOR REHEARING FILED:

**BEFORE WILSON, P.J., McDONALD AND LAWRENCE, JJ.**

**WILSON, P.J., FOR THE COURT:**

¶1.     In this divorce case, Jessy Smith appeals from the final judgment awarding custody of her two children to her ex-husband, Christopher Smith ("Smitty"), and dividing the marital estate. Jessy argues that the chancellor erred by granting custody to Smitty, by awarding her too little visitation, and by finding that businesses that Smitty started during the marriage were Smitty's separate property. We conclude that the chancellor did not err or abuse his discretion in awarding custody or visitation but erred by classifying one business as Smitty's separate property. Therefore, we affirm in part, reverse in part, and remand the case for further proceedings consistent with this opinion.

**FACTS AND PROCEDURAL HISTORY**

¶2.     Smitty and Jessy married in 2007.  They had two children during their marriage, a boy born in 2012 and a girl born in 2015.  During the marriage, Smitty owned and operated two businesses, which are discussed below.  Jessy primarily worked as a nurse at Anderson Regional Medical Center in Meridian.  The parties agree that they "separated" around September 1, 2019, although both continued to live in the marital home.  In October 2019, Jessy filed a complaint for divorce based on alleged habitual cruel and inhuman treatment or, in the alternative, irreconcilable differences.  Smitty filed a counterclaim for divorce based on adultery or, in the alternative, irreconcilable differences.  Jessy moved out of the marital home around November 1, 2019, and began a romantic relationship with another man about one month later.

*Child Custody and Visitation*

¶3.     Following a temporary hearing, the chancellor granted the parties temporary joint legal and physical custody of the children.  At trial, the parties submitted hundreds of text messages between the two of them from before their separation and during the temporary joint custody period.  The chancellor found that "[a]s with every other married couple with children, the text messages show agreements and disagreements, conflict and consensus, discussion and dictation, and affection and loathing."  However, the chancellor also noted that the text messages "illustrate . . . how both parties failed utterly in the exercise of temporary joint legal custody."

¶4.     During trial, Jessy accused Smitty of being controlling and manipulative and failing

to be attentive to the children's needs. Jessy also testified that Smitty threatened to take the children away from her if she divorced him. Smitty claimed that Jessy was selfish and not devoted to the children, stating, among other things, that she gave up some of her custodial time with the children and did not attend their school activities or sports events.

¶5. The chancellor determined from the testimony and evidence that Jessy initially "took primary responsibility for the day-to-day care of the children while Smitty worked hard to develop his business." However, "[i]n 2018, Jessy began working out at a gym and taking more time away from the children to devote time to herself and outside interests, leaving Smitty to be [children's] primary caretaker up to the time of separation."

¶6. While both parties complained that joint custody was difficult, the chancellor found "that both parents love and are devoted to their children," and this was "a case in which there are two fit parents, each jockeying for advantage over the other." The chancellor also found that Jessy made "unsubstantiated and untrue allegations" that "undercut [her] credibility and [made] the court question how many other of her assertions [were] untrue or exaggerated."

¶7. The chancellor found that a majority of the *Albright* factors were neutral.[1] With respect to the "home, school, and community record" factor, the chancellor found that it would be in the children's best interest to remain in the marital home because they had grown up there, and a number of their relatives lived nearby.

¶8. The chancellor noted that he "considered joint physical custody and would have liked to see it." However, the chancellor ultimately determined that neither joint legal custody nor

---

[1] *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983).

3

joint physical custody was workable between Jessy and Smitty. The chancellor found that Smitty strongly opposed joint custody and that the temporary joint custody arrangement had not worked well.

¶9. In 2022, the chancellor entered a final judgment, awarding physical and legal custody to Smitty. Jessy was awarded visitation the first, third, and fifth weekends of each month; two Wednesday evenings per month; holidays; and the month of July each summer.

*Property Division*

¶10. Prior to his marriage to Jessy, Smitty's father conveyed a parcel of land to Smitty. The property was located near land owned by several of Smitty's relatives, and Smitty planned to build a home there. In 2006, Smitty obtained construction loans for the property in his name. In 2008, after the parties were married, they executed a warranty deed making Jessy and Smitty joint tenants with rights of survivorship.

¶11. In 1995, Smitty formed a landscaping business, now known as Horticulture Services LLC. Smitty continued operating the business throughout the parties' marriage. In 2010, Smitty purchased property to start a second business, Midway RV and Boat Storage LLC, which he also operated throughout the marriage.

¶12. In the final judgment, the chancellor assessed a single valuation for "both existing businesses together." Jessy urged the chancellor to use an income-based approach, but the chancellor found that an asset-based approach was more appropriate because it excluded goodwill and because the evidence was insufficient to establish an income-based valuation. The chancellor further noted that he did not use the values Jessy provided because she valued

4

items based on their cost rather than their fair market value.

¶13. The chancellor found that both Horticulture Services and Midway were Smitty's separate property and thus were not subject to equitable division. In determining that the businesses were Smitty's separate property, the chancellor noted that Jessy did not work in or help build either business and that she was not obligated on any business loans. The chancellor further indicated that Smitty kept the businesses' banking separate from his personal accounts. There was also testimony that Smitty sometimes used one business's accounts for the other business's expenses or for personal and family expenses. However, the chancellor found "no evidence of commingling that would justify classifying the businesses as marital."

¶14. After applying the *Ferguson* factors,[2] the chancellor determined Smitty was entitled to the exclusive use, ownership, and possession of the marital home, with Jessy to be paid for her share of the equity.

*Procedural History*

¶15. In March 2021, the chancellor granted Smitty a divorce based on Jessy's admitted and uncondoned adultery.[3] After a five-day trial in August and December 2021, the chancellor issued an opinion and judgment granting physical and legal custody of the parties' two children to Smitty, granting visitation to Jessy, and dividing the marital estate. Jessy filed

---

[2] *Ferguson v. Ferguson*, 639 So. 2d 921, 928 (Miss. 1994).

[3] Jessy admitted that she committed adultery both before and after the parties separated. She admitted to having an affair beginning in 2017. She testified that she began a romantic relationship with her current husband about one month after she moved out of the marital home. Jessy married her current husband in September 2021.

a motion to alter or amend the judgment or for a new trial, which was denied in relevant part, and a notice of appeal.

**ANALYSIS**

¶16.    On appeal, Jessy argues that the chancellor erred (1) by granting Smitty physical and legal custody; (2) by refusing to grant joint legal custody; (3) by granting her inadequate visitation; (4) in finding that Smitty's businesses were his separate property; (5) by assessing a combined value for Smitty's two businesses; (6) by using an asset-based approach to value the businesses; and (7) by denying her motion to alter or amend the judgment or for a new trial.

### I.    Custody

¶17.    Jessy argues the chancellor erred by granting Smitty physical and legal custody of their children and by refusing to grant joint legal custody.  Specifically, Jessy argues the chancellor abused his discretion in finding that two *Albright* factors—the "stability of home environment and employment of each parent" and the "willingness and capacity to provide primary child care," *Albright*, 437 So. 2d at 1005—did not favor her.  Jessy also argues the chancellor erred in finding that the children's "home, school and community record" (*id.*) favored Smitty.

¶18.    "A chancellor's custody decision will be reversed only if it was manifestly wrong or clearly erroneous, or if the chancellor applied an erroneous legal standard." *Smith v. Smith*, 97 So. 3d 43, 46 (¶7) (Miss. 2012).  "[T]his Court cannot reweigh the evidence and must defer to the chancellor's findings of the facts, so long as they are supported by substantial

6

evidence." *Hall v. Hall*, 134 So. 3d 822, 828 (¶21) (Miss. Ct. App. 2014). "[T]he issue is not whether this Court 'agrees with the chancellor's ruling,' but only whether 'the chancellor's ruling is supported by credible evidence.'" *Sanders v. Sanders*, 281 So. 3d 1043, 1049-50 (¶21) (Miss. Ct. App. 2019) (quoting *Hammers v. Hammers*, 890 So. 2d 944, 950 (¶14) (Miss. Ct. App. 2004)).

¶19.   "[T]he polestar consideration in child custody cases is the best interest and welfare of the child." *Albright*, 437 So. 2d at 1005. In determining what custodial arrangement is in a child's best interest, the chancellor should consider the totality of the relevant circumstances, including the following factors: (1) age, health, and sex of the child; (2) "continuity of care prior to the separation"; (3) "parenting skills" of the respective parents; (4) the parents' "willingness and capacity to provide primary child care"; (5) the parents' respective employments and employment responsibilities; (6) "physical and mental health and age of the parents"; (7) "emotional ties of parent and child"; (8) the "moral fitness" of the parents; (9) "the home, school and community record of the child"; (10) the "preference" of a child who is at least twelve years old; (11) "stability of home environment and employment of each parent"; and (12) any "other factors relevant to the parent-child relationship." *Id.*

### A.   Stability of Home Environment and Employment

¶20.   Under this factor, the chancellor found that Smitty was living "in the former marital residence where he ha[d] lived for the past 14 years" and that "his employment [was] stable." The chancellor found that "Jessy ha[d] lived at" three addresses—two in Collinsville and one

in Vossburg—since the parties separated and that "[h]er employment ha[d] been stable, although she did recently change jobs." The chancellor did not state that this factor favored either party.[4] On appeal, Jessy argues that the chancellor "abused [his] discretion and ignored relevant testimony" by finding that this "factor did not favor [her]." However, Jessy does little to elaborate on this argument, and substantial evidence supports the chancellor's findings.[5] The chancellor did not err or abuse his discretion in applying this factor.

### B. Willingness and Capacity to Provide Primary Childcare and Employment Responsibilities

¶21. The chancellor found that both Jessy and Smitty had "proven their willingness and capacity to provide care for the children" and "to spend time with . . . and devote attention to the children outside of work time." The chancellor also found that each party's employment was "flexible enough" to "deal with emergencies, special events, and activities of the children." The chancellor did not state that these factors favored either party. On appeal, Jessy argues that the chancellor did not give sufficient weight to her testimony that she could set her work schedule so that she could be home with the children more than Smitty. Jessy also argues that the chancellor failed to "mention[] . . . how much [she] has

---

[4] "The chancellor must address each *Albright* factor that is applicable to the case, but the chancellor need not decide that each factor favors one parent or the other." *Riley v. Heisinger*, 302 So. 3d 1243, 1255 (¶46) (Miss. Ct. App. 2020) (citation omitted).

[5] Later in her brief, Jessy argues that the chancellor "misstated the facts" when he found that Jessy had lived at a home that her new husband owned in Vossburg, which was about fifty miles away from the children's school in Collinsville. However, Jessy herself testified that both children had bedrooms at the Vossburg home, that they spent the night in Vossburg "[p]robably once a week," including some school nights, and that she and her family all stayed in Vossburg during the trial. Based on Jessy's own testimony, the chancellor did not clearly err by stating that Jessy "ha[d] lived at" the Vossburg address.

8

been able to stay at home after marrying [her new husband]." However, Smitty testified that as the owner of his own businesses, he also has a flexible work schedule and is never required to travel for work. Substantial evidence supports the chancellor's findings, and the chancellor did not abuse his discretion in considering these factors.

### C.    Home, School, and Community Record

¶22.    Under this *Albright* factor, the chancellor noted that Smitty lived in the former family home "where the children ha[d] grown up." The home was "located in close proximity to other Smith relatives," including cousins, aunts, uncles, and grandparents.[6] The extended Smith family socialized and ate meals together frequently. The chancellor also noted that "[t]he children ha[d] been active in," and "ha[d] grown up" in, a local church that they continued to regularly attend with Smitty. The children attended a nearby elementary school, "which has a reputation for excellence."[7] The chancellor found that the marital home and its surrounding environment were "a comfortable, secure place where [the children] ha[d] lived exclusively until the separation." The chancellor found that "it would not be in [the children's] best interest to uproot them from there," stating that this *Albright* factor was "key" in his analysis.

---

[6] Jessy emphasized that her new husband's family also lived nearby. However, the chancellor noted that Jessy herself first met her new husband in December 2019, less than two years before trial. According to Jessy, she first introduced her children to her new husband "in the fall of 2020." Even then, she introduced him only as "a friend that was helping around the house."

[7] The chancellor acknowledged that Jessy resided nearby "in the neighborhood of the [children's] school." The chancellor noted that "Jessy ha[d] moved on to another church in Clarke County."

¶23. On appeal, Jessy argues that the chancellor should have treated this factor as "neutral at best." However, substantial evidence supports the chancellor's findings, and we cannot say that the chancellor abused his discretion by giving weight to the circumstances that he considered under this factor. Accordingly, this issue is without merit.

### D.    Failure to Award Joint Physical and Legal Custody

¶24. Finally, Jessy argues that even if she is not entitled to sole physical custody, the chancellor at least should have awarded the parties joint physical and legal custody. In his ruling, the chancellor addressed this issue, stating in part:

> The court has considered joint physical custody and would have liked to see it in this case, but Smitty strongly opposes it and Jessy agrees that it did not work on a temporary basis. Each party blames the other. . . .
>
> Likewise, the court has considered joint legal custody, but joint legal custody requires parental consultation and agreement on all major decisions affecting the children tantamount to the level of consultation and agreement one would expect in an intact nuclear family. *Rutledge v. Rutledge*, 487 So. 2d 218, 219 (Miss. 1986). This court gave the parties in the temporary order an opportunity to prove that they could consult with each other and reach agreement on major issues for the best interest of the children and to learn productive ways to approach those kinds of issues, but they failed. Both admit that the joint custody arrangement has not worked.

¶25. Jessy argues that the chancellor gave too much weight to Smitty's opposition to joint custody. Jessy argues that the chancellor has discretion to award joint custody so long as "the parents are *capable* of sharing joint custody cooperatively." *Crider v. Crider*, 904 So. 2d 142, 147 (¶13) (Miss. 2005) (emphasis added). And she argues that she and Smitty are "capable" of cooperating, even if they have struggled to do so in the past.

¶26. At trial, Jessy answered in the affirmative when her attorney asked her whether she

"would go to the extent of allowing for joint custody if it was in the best interest of her children." At the same time, however, Jessy insisted that joint custody was *not* in the children's best interest. Moreover, Jessy testified on direct examination, "Given that [Smitty] does not co-parent well with me, *no*, [*joint custody*] *is not practical*." (Emphasis added). As the chancellor noted, Jessy and Smitty each repeatedly blamed the other for their difficulties co-parenting. In the final judgment, the chancellor also found Jessy in contempt for sending Smitty harassing text messages during the period they shared joint custody under the temporary order. Jessy also testified, "I don't trust [Smitty] at all, even in little things . . . ."

¶27. As the chancellor noted in his opinion, our Supreme Court has stated,

> The essence of joint custody is that both parents share responsibility and authority with respect to the children. This involves parental consultation and agreement on all major decisions affecting the children. The decision making process thus approximates that of an intact nuclear family. Parents with joint custody make joint decisions on all matters having a significant impact on their children's lives.

*Rutledge*, 487 So. 2d at 219 (quoting David J. Miller, *Joint Custody*, 13 Family L.Q. 345, 360 (1979)). Moreover, in *Crider*, the Supreme Court stated, "To be sure, unless the parents are capable of sharing joint custody cooperatively, it is incumbent upon a chancellor *not* to award joint custody. *This is for the chancellor to determine as he or she is in the best position to evaluate the credibility, sincerity, capabilities and intentions of the parties*." *Crider*, 904 So. 2d at 147 (¶13) (emphasis added). Here, the chancellor personally observed the parties and their demeanor and found that an award of joint physical or legal custody would not be in the children's best interest. *Id.* at 144 (¶6) ("[T]he polestar consideration in all cases dealing with child custody and visitation is the best interest and welfare of the child."). Given the

11

parties' history, testimony, and demonstrated difficulties co-parenting, we cannot say that the chancellor's finding was an abuse of discretion.

## II.    Visitation

¶27.    Jessy next argues the chancellor granted her inadequate visitation. "Visitation is a matter within the chancellor's sound discretion." *Thomas v. Thomas*, 281 So. 3d 1191, 1204 (¶41) (Miss. Ct. App. 2019) (quoting *Carson v. Butler*, 168 So. 3d 1085, 1088 (¶14) (Miss. Ct. App. 2013)). "The chancellor is charged with fashioning a visitation schedule that is in the best interests of the children, and the chancellor's visitation decision is afforded great deference by this Court." *Id.* "In general, visitation with the noncustodial parent should be liberal rather than restricted." *Id*. "Standard visitation includes two weekends a month until Sunday afternoon and at least five weeks of summer visitation, plus some holiday visitation. Awarding less is an abuse of discretion unless there is concrete proof of actual harm to a child." *Michael v. Smith*, 237 So. 3d 183, 190 (¶26) (Miss. Ct. App. 2018) (quotation marks, citations, and brackets omitted).

¶28.    In this case, the chancellor awarded Jessy the first, third, and fifth weekends of each month from 6 p.m. Friday until 6 p.m. Sunday; two Wednesday evenings per month from 5 p.m. to 7:30 p.m.; typical holiday visitation; Spring Break every other year; and summer visitation "for the month of July, during which Smitty shall have one weekend visitation."

¶29.    On appeal, Jessy suggests a series of additional visitation times that the chancellor could have granted, and she argues that "there is no reason why" the chancellor did not do so. Jessy cites no authority for this argument other than quoting this Court's observation that

"[t]he point of *Albright* is to identify the custody arrangement that would be in *the child's* best interest—not to determine what is in either parent's best interest or which parent is the better person." *Vassar v. Vassar*, 228 So. 3d 367, 375 (¶26) (Miss. Ct. App. 2017).

¶30.    The visitation that the chancellor granted here is essentially the "[s]tandard visitation" that this Court outlined in *Michael*, 237 So. 3d at 190 (¶26). The "month of July" is slightly less than the "five weeks of summer visitation" mentioned in *Michael*, but this minor difference is offset by the chancellor's award of visitation during "fifth weekends" and evening visitation two Wednesdays per month. In *Marshall v. Harris*, 981 So. 2d 345 (Miss. Ct. App. 2008), we affirmed a similar award of summer visitation for the month of July, explaining that our case law does "not mandate a five-week summer visitation," and a "chancellor has discretion to fashion a visitation order to suit the child's best interest." *Id.* at 350 (¶23); *accord Strange v. Strange*, 43 So. 3d 1169, 1172 (¶¶8-10) (Miss. Ct. App. 2010). Similarly, although we are sympathetic to Jessy's desire for additional court-ordered visitation, we cannot say that the chancellor's decision was an abuse of discretion.[8]

### III.    Smitty's Businesses

#### A.    Classification of the Businesses

¶31.    Jessy argues that the chancellor's equitable division of the marital estate must be reversed because the chancellor misclassified Smitty's two businesses, Horticulture Services and Midway, as Smitty's separate property.

---

[8] We note that Smitty testified at trial that he "would be comfortable if [Jessy] had [visitation] for eight to ten days" per month, and the court's visitation schedule provides that "Jessy may visit at all other reasonable times and places as agreed to by the parties."

13

¶32. The first step in dividing the marital estate is classifying the parties' assets as marital or separate. *Pearson v. Pearson*, 761 So. 2d 157, 162 (¶15) (Miss. 2000). Marital property is defined as "any and all property acquired or accumulated during the marriage." *Hemsley v. Hemsley*, 639 So. 2d 909, 915 (Miss. 1994). "Assets acquired or accumulated during the course of a marriage are subject to equitable division unless it can be shown by proof that such assets are attributable to one of the parties' separate estates prior to the marriage or outside the marriage." *Id.* at 914.

¶33. "A business interest owned prior to marriage is the separate property of the owning spouse, at least to the extent of its value at the time of the marriage." *Dean v. Dean*, 304 So. 3d 156, 166 (¶36) (Miss. Ct. App. 2020) (quoting *Kimbrough v. Kimbrough*, 76 So. 3d 715, 720 (¶22) (Miss. Ct. App. 2011)). "Appreciation of a separate business interest, which occurs during the marriage and is attributable to the efforts of *either spouse*, is marital property." *Id*. (emphasis added) (quoting *Kimbrough*, 76 So. 3d at 720 (¶22)). "If the appreciation was caused by other forces, such as inflation or third-party efforts, then the entire asset remains separate." Deborah H. Bell, *Mississippi Family Law* § 8.03[3][b], at 241 (3d ed. 2020). "*The burden of proof is on the non-owning spouse to show both the appreciation in value of the separate business interest and that such appreciation was attributable to the efforts of either spouse.*" *Dean*, 304 So. 3d at 166 (¶36) (quoting *Kimbrough*, 76 So. 3d at 720 (¶22)).

¶34. Although Smitty formed Horticulture Services LLC in 2008, the chancellor found that the limited liability company was formed "to provide a more advantageous tax and legal

14

structure" for the landscaping business that Smitty started in 1995, long before the marriage. Substantial evidence supports the chancellor's finding. Therefore, the value of this business at the time of the marriage was Smitty's separate property, and Jessy bore the "burden of proof . . . to show both the appreciation in value of the [business] and that such appreciation was attributable to the efforts of either" Smitty or her. *Id.* (emphasis omitted).

¶35.    On appeal, Jessy asserts that Horticulture Services' value "increased significantly during the marriage."  However, Jessy offered *no proof* at trial of this alleged increase in value or its cause. *See Touchstone v. Touchstone*, 682 So. 2d 374, 380 (Miss. 1996) ("This Court will consider only those matters that actually appear in the record and does not rely on mere assertions in briefs."). Therefore, the chancellor did not err by finding Jessy failed to prove that any part of Horticulture Services is marital property. *Dean*, 304 So. 3d at 167 (¶38) (holding that the chancellor did not err by finding that husband's business interest acquired prior to marriage was husband's separate property because wife failed to prove that its value appreciated during the marriage due to the efforts of either party).

¶36.    However, Midway presents a different issue because Smitty started it during the marriage in 2010.  Midway operates on a 3.22-acre parcel of land in Meridian that Smitty purchased in his own name in 2010.  To acquire the property, Smitty took out loans from a bank, his father, and other relatives.  Later, Smitty repaid his father by borrowing $100,000 on a line of credit that was secured by the marital residence.  Midway offers storage for RVs and boats in two large buildings.  The property also has an office building and other smaller buildings.  Initially, Jessy operated a "boutique" clothing and gifts store, "Bloom," on the

15

property. Jessy testified that she also helped with the rest of Midway's business as needed. However, Bloom was not profitable and closed around 2017. After Bloom closed, Midway leased that part of the property to Al's Garden and Gift, a nursery and floral/gift shop. During this proceeding, the entire property was appraised at $659,000, and the chancellor found that the net equity in the property was $367,993.

¶37. As this Court recently explained,

> [m]arital property is defined as any and all property acquired or accumulated during the marriage. . . . The law presumes that all property acquired or accumulated during marriage is marital property. The party claiming that [an] asset is separate, nonmarital property has the burden of proof and must overcome the presumption that the asset is marital property.

*Cannon v. Cannon*, 375 So. 3d 697, 710 (¶43) (Miss. Ct. App. 2023) (citations and quotation marks omitted).

¶38. In the present case, Smitty failed to meet his burden to prove that Midway and the associated real property are not marital assets. There is no dispute that Smitty acquired the property and started the business during the marriage. In addition, he operated the business during the marriage for more than eight years before the parties separated. Jessy assisted with the business at times, though the significance of her assistance is disputed. Smitty also admitted that he contributed personal funds (i.e., marital property) to the business, and he took out a line of credit on the marital home to pay off debt that he used to start the business. During the parties' marriage, Smitty accumulated equity in Midway with a value of at least $367,993. However, Smitty failed to prove that he accumulated this equity without using marital funds or his own efforts during the marriage. Accordingly, Smitty failed to prove that

16

the business and property are not marital assets, and the chancellor erred by classifying them as Smitty's separate property.

¶39. On appeal, Smitty argues that Jessy is not entitled to any of the equity in Midway or the property because she had little involvement in Midway's day-to-day business. However, "[w]e assume for divorce purposes that the contributions and efforts of the marital partners, whether economic, domestic or otherwise are of equal value." *Hemsley*, 639 So. 2d at 915. Therefore, the fact that Jessy may have played a minor role in Midway's operations does not mean that the business is not a marital asset. More important, Smitty points us to no evidence in the record to show that he accumulated his equity in Midway with separate assets or due to factors other than his own efforts. Therefore, Midway and the associated real property should have been classified as marital assets. On remand, the chancellor must make a new equitable distribution of the marital estate that includes these assets.

## B. Valuation of the Businesses

¶40. Jessy next argues the chancellor erred by assessing a joint value on Horticulture Services and Midway and by using an asset-based approach to value the businesses.

¶41. After a chancellor classifies assets as marital or separate property, the next step is for the chancellor to value those assets. *Brown v. Brown*, 350 So. 3d 1169, 1178 (¶30) (Miss. Ct. App. 2022). The chancellor seeks to determine the "market value" of the assets. *Ferguson*, 639 So. 2d at 929. "Three methods of valuation may be used to determine the market value of a business for this purpose: '(1) an asset-based approach, in which assets and liabilities are evaluated, (2) a market-based approach, in which the market is surveyed for

17

similar sales, or (3) an income-based approach, in which a value is placed on earning potential.'" *Dean*, 304 So. 3d at 163 (¶21) (quoting *Lacoste v. Lacoste*, 197 So. 3d 897, 907 (¶34) (Miss. Ct. App. 2016)).

¶42.     "The bottom line is one must arrive at the 'fair market value' or that price at which property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell." *Id.* (brackets and ellipsis omitted). "[T]he chancellor should require that the parties utilize a reliable method of valuation and support it with adequate proof, or prove valuation through expert testimony." *Chism v. Chism*, 285 So. 3d 656, 665 (¶28) (Miss Ct. App. 2019). However, "findings on valuation do not require expert testimony and may be accomplished by adopting the values cited in the parties' [Uniform Chancery Court Rule] 8.05 financial disclosures, in the testimony, or in other evidence." *Lacoste*, 197 So. 3d at 908 (¶35) (quoting *Jenkins v. Jenkins*, 67 So. 3d 5, 13 (¶19) (Miss. Ct. App. 2011)). "If a party fails to provide accurate or sufficient information or cooperate in the valuation of an asset, the chancellor is entitled to proceed on the best information available to him or her." *Lageman v. Lageman*, 313 So. 3d 1075, 1080 (¶8) (Miss. Ct. App. 2021). "[T]he fair market value of a business is a question for the trier of fact," and "we defer to the chancellor's findings of fact when supported by the evidence and not manifestly wrong." *Cox v. Cox*, 61 So. 3d 927, 936 (¶29) (Miss. Ct. App. 2011).

¶43.     The chancellor found Jessy's suggestion to use an income-based approach "problematic" and decided to use an asset-based approach to determine the value of the

businesses. The chancellor explained:

> [T]he Mississippi Supreme Court has emphasized that valuation of a business must not include goodwill, and it must be based on the business's fair market value. Fair market value without goodwill is the value of the assets. Second, the income approach uses goodwill as a key component of its analysis. Third, the income approach requires projection of future income applying factors and formulae beyond the expertise of this court, and requiring data not in this record. The court finds that using the asset approach to valuation is most appropriate in this case, and it can be accomplished with the data in the record.

The chancellor then went on to list the assets of both Horticulture Services and Midway—without specifying which assets belonged to which business—and their value, with a total value of $425,893.

¶44. In determining the values of the businesses' assets, the chancellor did not use Jessy's values because Jessy used the items' original costs as shown on a "tax return depreciation schedule." The chancellor reasoned that "[c]ost is not fair market value." For the most part, the chancellor accepted Smitty's valuations of the businesses' trucks, equipment, and other personal property. Smitty testified that his valuations were based on his own assessments of the items' fair market values. By far, the most valuable asset of either business was Midway's real property, which was valued by a court-appointed real estate appraiser. Neither party takes issue with the appraiser's valuation.

¶45. Under the circumstances, we cannot say the chancellor erred or abused his discretion by using an asset-based approach. *See Dean*, 304 So. 3d at 163 (¶21) (explaining that an asset-based approach is a permissible valuation method). Nor can we say that the chancellor otherwise erred or abused his discretion in valuing the businesses' various assets.

¶46. However, as discussed above, the chancellor erred in finding that Midway and its real

19

property were Smitty's separate property. Because Midway and the real property are marital assets subject to equitable distribution, the chancellor must determine a value for them. *Brown*, 350 So. 3d at 1184 (¶44). These marital assets may not be lumped together with Horticulture Services, which was properly classified as Smitty's separate property. Therefore, on remand, the chancellor must determine Midway's fair market value and then include it in the equitable distribution of the marital estate.[9]

**CONCLUSION**

¶47. The chancellor did not commit any legal error or abuse his discretion in awarding custody to Smitty and visitation to Jessy. However, the chancellor did err by classifying Midway as Smitty's separate property and by not assigning a value to Midway as part of the equitable distribution of the marital estate. Therefore, the judgment of the chancery court is affirmed with respect to child custody and visitation and reversed with respect to the equitable distribution of the marital estate. The case is remanded for a new equitable distribution of the marital estate, including Midway and the associated real property.

¶48. **AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**[10]

**BARNES, C.J., CARLTON, P.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**

---

[9] As noted above, Jessy also argues that the chancellor erred by denying her motion to alter or amend the judgment or for a new trial. However, her argument on this issue simply incorporates her arguments on her other issues, which we have already addressed above. Therefore, this issue requires no additional discussion.

[10] Smitty filed a motion for appellate attorney's fees in this Court. However, Smitty's motion cites no legal authority for an award of such fees. Therefore, the motion is denied.